FILED

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2006 APR 27  A 11: 49

RECEIPT #
AMOUNT $ 350
SUMMONS ISSUED   Y-20
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE              4-27-06

DAVID PARKER, TONIA PARKER, Individually
and as next friends and guardians of Jacob Parker and
Joshua Parker, JACOB PARKER, JOSHUA PARKER, )

)
JOSEPH ROBERT WIRTHLIN, ROBIN WIRTHLIN,     )
Individually and as next friends and guardians of         )
Joseph Robert Wirthlin, Jr.,                                         )
JOSEPH ROBERT WIRTHLIN, Jr.,                            )
                                                                                    )
  PLAINTIFFS                                                       )
                                                                                    )
vs.                                                                                  )
                                                                                    )
WILLIAM HURLEY, PAUL B. ASH, PH.D,             )
Individually and as Superintendents of the Town of       )
Lexington Public Schools,                                            )
                                                                                    )
HELEN LUTTON COHEN, THOMAS R. DIAZ,       )
OLGA GUTTAG, SCOTT BURSON,                        )
THOMAS GRIFFITH, Individually and as members of  )
the Town of Lexington School Committee,                   )
                                                                                    )
ANDRE RAVENELLE, Individually and as Director of )
Education of the Town of Lexington,                           )
                                                                                    )
JONI JAY, Individually and as Principal of the             )
Estabrook Elementary School,                                     )
                                                                                    )
JENNIFER WOLFRUM, Individually and as               )
Coordinator of Health Education,                                )
                                                                                    )
HEATHER KRAMER, Individually and as a Teacher  )
at the Estabrook Elementary School, and                     )
                                                                                    )
TOWN OF LEXINGTON,                                         )
                                                                                    )
  DEFENDANTS                                                    )

**COMPLAINT AND
JURY DEMAND**

06 - 10751 MLW

MAGISTRATE JUDGE

## INTRODUCTION

This is a claim brought by four parents and their very young children against the Town of Lexington, its school board, various administrators and a teacher. The plaintiffs are devout Judeo-Christians. They claim that the defendants have intentionally interfered with their Fourteenth Amendment due process rights to direct the moral upbringing of their own children.

The defendants have begun a campaign of intentionally indoctrinating very young children to affirm the notion that homosexuality is right and moral, in direct denigration of the plaintiffs' deeply-held faith. The plaintiffs tolerate and respect all people but wish to teach their faith to their children at their own pace, and in their own way.

The claim is brought pursuant to 42 U.S.C. § 1983, the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I, and the Massachusetts Opt Out Statute.

## PARTIES

1.  The plaintiff David Parker is an individual who lives at 541 Bedford Street, Town of Lexington, County of Middlesex, Commonwealth of Massachusetts.

2.  The plaintiff Tonia Parker is an individual who lives at 541 Bedford Street, Town of Lexington, County of Middlesex, Commonwealth of Massachusetts. Hereinafter, the plaintiffs David Parker and Tonia Parker will be referred to from time to time collectively as the "adult plaintiffs."

3.  The plaintiff Jacob Parker is an individual who lives at 541 Bedford Street, Town of Lexington, County of Middlesex, Commonwealth of Massachusetts. Jacob Parker is a minor child. His parents and legal guardians are the plaintiffs Tonia and David Parker.

2

4.   The plaintiff Joshua Parker is an individual who lives at 541 Bedford Street, Town of
     Lexington, County of Middlesex, Commonwealth of Massachusetts. Joshua Parker is a
     minor child. His parents and legal guardians are the plaintiffs Tonia and David Parker.

5.   The plaintiff Joseph Robert Wirthlin is an individual who lives at 71 Bedford Street,
     Town of Lexington, County of Middlesex, Commonwealth of Massachusetts.

6.   The plaintiff Robin Olsen Wirthlin is an individual who lives at 71 Bedford Street, Town
     of Lexington, County of Middlesex, Commonwealth of Massachusetts. Hereinafter, the
     plaintiffs Joseph Wirthlin and Robin Wirthlin will be referred to from time to time
     collectively as the "adult plaintiffs."

7.   The plaintiff Joseph Robert Wirthlin, Jr. is an individual who lives at 71 Bedford Street,
     Town of Lexington, County of Middlesex, Commonwealth of Massachusetts. Joseph
     Robert Wirthlin, Jr. is a minor child. His parents and legal guardians are the plaintiffs
     Joseph and Robin Wirthlin.

8.   The defendant William Hurley is an individual whose residence is unknown to the
     plaintiffs. Plaintiffs aver that Mr. Hurley is domiciled within the Commonwealth of
     Massachusetts. Mr. Hurley was at pertinent times the Superintendent of the Public
     Schools of the Town of Lexington, County of Middlesex, Massachusetts and regularly
     does business within said Town.

9.   The defendant Paul B. Ash, Ph.D. is an individual whose residence is unknown to the
     plaintiffs. Plaintiffs aver that Dr. Ash is domiciled within the Commonwealth of
     Massachusetts. Dr. Ash is the current Superintendent of the Public Schools of the Town
     of Lexington, County of Middlesex, Massachusetts and regularly does business within

3

said Town.

10. The defendant Helen Lutton Cohen is an individual whose residence is unknown to the plaintiffs. Plaintiffs aver that Ms. Cohen is domiciled within the Commonwealth of Massachusetts. Ms. Cohen at all pertinent times was a duly elected member of the School Committee of the Public Schools of the Town of Lexington, County of Middlesex, Massachusetts and regularly does business within said Town.

11. The defendant Thomas R. Diaz is an individual whose residence is unknown to the plaintiffs. Plaintiffs aver that Mr. Diaz is domiciled within the Commonwealth of Massachusetts. Mr. Diaz at all pertinent times was a duly elected member of the School Committee of the Public Schools of the Town of Lexington, County of Middlesex, Massachusetts and regularly does business within said Town.

12. The defendant Olga Guttag is an individual whose residence is unknown to the plaintiffs. Plaintiffs aver that Ms. Guttag is domiciled within the Commonwealth of Massachusetts. Ms. Guttag at all pertinent times was a duly elected member of the School Committee of the Public Schools of the Town of Lexington, County of Middlesex, Massachusetts and regularly does business within said Town.

13. The defendant Scott Burson is an individual whose residence is unknown to the plaintiffs. Plaintiffs aver that Mr. Burson is domiciled within the Commonwealth of Massachusetts. Mr. Burson at all pertinent times was a duly elected member of the School Committee of the Public Schools of the Town of Lexington, County of Middlesex, Massachusetts and regularly does business within said Town.

14. The defendant Thomas Griffith is an individual whose residence is unknown to the

4

plaintiffs. Plaintiffs aver that Mr. Griffith is domiciled within the Commonwealth of Massachusetts. Mr. Griffith at all pertinent times was a duly elected member of the School Committee of the Public Schools of the Town of Lexington, County of Middlesex, Massachusetts and regularly does business within said Town.

15.     The defendant Andre Ravenelle is an individual whose residence is unknown to the plaintiffs. Plaintiffs aver that Mr. Ravenelle is domiciled within the Commonwealth of Massachusetts. Mr. Ravenelle is and at all pertinent times was the Director of Education for the Town of Lexington, County of Middlesex, Massachusetts and regularly does business within said Town.

16.     The defendant Joni Jay is an individual whose residence is unknown to the plaintiffs. Plaintiffs aver that Ms. Jay is domiciled within the Commonwealth of Massachusetts. Ms. Jay is and at all pertinent times was the Principal of the Estabrook Elementary School, an elementary school located in the Town of Lexington, County of Middlesex, Massachusetts and regularly does business within said Town.

17.     The defendant Jennifer Wolfrum is an individual whose residence is unknown to the plaintiffs. Plaintiffs aver that Ms. Wolfrum is domiciled within the Commonwealth of Massachusetts. Ms. Wolfrum was at pertinent times the Co-ordinator of Health Education of the Town of Lexington, County of Middlesex, Massachusetts and regularly does business within said Town.

18.     The defendant Heather Kramer is an individual whose residence is unknown to the plaintiffs. Plaintiffs aver that Ms. Kramer is domiciled within the Commonwealth of Massachusetts. Ms. Kramer was at pertinent times a teacher at the Estabrook Elementary

5

School, an elementary school located in the Town of Lexington, County of Middlesex, Massachusetts and regularly does business within said Town.

19. The defendant Town of Lexington, County of Middlesex, Massachusetts is a municipal corporation that can sue and be sued.

## FACTS COMMON TO ALL COUNTS

### THE PARKERS

20. At all pertinent times, David and Tonia Parker, the adult plaintiffs, were married to one another. The adult plaintiffs are the natural parents of the plaintiffs Jacob and Joshua, who were born on March 27, 1999, and October 30, 2000, respectively.

21. In or around 2004, the adult plaintiffs, together with their two natural children, moved to Lexington, Massachusetts following a corporate restructuring by Mr. Parker's employer.

22. The adult plaintiffs were attracted to the Town primarily by its highly-touted school system.

23. The plaintiffs are devout Judeo-Christians. Included in their core Judeo-Christian beliefs is the concept that issues pertaining to sexual intimacy, procreation, human sexuality, and the holy basis of matrimony should remain private within families, be introduced by parents, and governed by the laws of the God of Abraham. Also included is the concept that homosexual behavior is immoral in that it violates God's law.

24. The Parkers enrolled Jacob in the public schools upon reaching kindergarten age. In September 2004, five-year old Jacob began attending kindergarten classes at Estabrook Elementary School.

25. Almost immediately thereafter, the defendants commenced an intentional campaign to

6

teach the Parkers' very young child that the family's religious faith was incorrect.

26. On January 14, 2005, Jacob Parker brought home a "Diversity Book Bag." The ostensible purpose of the "book bag" was "intended to strengthen the connections among our school population and build an atmosphere of tolerance and respect for cultural racial ability and family structure diversity." The goal according to the defendants was to "engage the student and parent population in a sustained effort of acknowledging and celebrating the diverse backgrounds and families in our school community." The bag contained a book titled, Who's in a Family by Robert Skutch. Upon reviewing the book, the Parkers realized that the book appeared to depict homosexual couples with children. The Parkers had received no notice that these materials would be sent home at that time.

27. Jacob is now in the first grade. First graders have a "reading center" in the classroom that serves as a mini-library. The same book, Who's in a Family, is in Jacob's reading center along with an additional book, Molly's Family by Nancy Garden, depicting gay and lesbian relationships and gay and lesbian marriage. These books are available to Jacob without parental notification and there is no method by which the Parkers could exercise an opt-out option. They are available without parental supervision.

28. This subject is one of great concern to the Parkers. By virtue of their strong religious faith, the Parkers adhere to a religious principle that holds that marriage is holy matrimony by definition, a union between a man and a woman, and that labeling marriage to be otherwise is immoral. The notion of the acceptable interchangeability of male and female within the marriage construct and within a personal identity dictated by nature is not consistent with the Parkers' sincerely-held religious beliefs, nor is the sexual acting

7

out of same-sex attraction (homosexuality).

29.     The Parkers recognize that at some point, their children will be exposed to the knowledge
        that the Commonwealth of Massachusetts endorses as legal some marriages they believe
        to be inconsistent with their faith. However, they did not wish to discuss the topic of
        homosexual marriage or homosexuality and transgenderism with Joshua or Jacob at their
        current ages.

30.     On information and belief, the individual defendants Joni Jay and William Hurley, as
        well as the defendant School Committee members, were among those individually
        responsible for introducing the book Who's in a Family to Jacob's class, and they did so
        on behalf of the Town. When they and the Town included Who's in a Family in the book
        bag, they acted with the specific intention to indoctrinate young children into the concept
        that homosexuality and homosexual relationships or marriage are moral and acceptable
        behavior.

31.     In order to determine whether their child would receive additional information in school
        related to homosexuality and transgenderism, the Parkers initiated a dialogue via email
        with the Principal of the School, Joni Jay, and the Superintendent of Schools, William
        Hurley. On January 21, 2005, David and Tonia Parker met with Principal Jay to discuss
        their concern. At this meeting, the Parkers repeatedly objected to any exposure to or
        discussions of homosexuality, transgenderism, bisexuality, sexual orientation, and
        homosexual marriage by any adult within the School to their five-year-old son. Ms. Jay
        responded, "Any adult within the school can discuss homosexual families and
        homosexual issues with your child. This is not a parental notification issue."

8

32.    On or around February 8, 2005, the Parkers began attending the Estabrook Elementary
       School's Anti-Bias Committee meetings. On February 8, 2005, the couple attended a
       meeting featuring Jon Pfeifer, a Gay Lesbian Straight Education Network (GLSEN)
       representative. The meeting's subject was titled "How and Why to Talk to Your Children
       about Diversity." In fact, the meeting focused exclusively upon homosexuality and how
       to acclimate young children to it. Mr. Pfeifer encouraged the Committee to place many
       homosexual family books in each classroom, hang gay and lesbian family posters in each
       classroom, and encourage teacher-initiated discussions in each class. Mr. Pfeifer's
       response to one parent's comment that kids learn negative jargon at a young age was
       "kids learn easier . . . go through year after year and it'll be better." Several teachers and
       the Principal of the Estabrook Elementary School attended the meeting, and visibly and
       verbally affirmed this action plan.

33.    On information and belief, the Town, School Committee, Ms. Jay, Mr. Hurley, and Dr.
       Ash have adopted Mr. Pfeifer's suggestions. On information and belief, the purpose of
       adopting these suggestions is the specific intention to indoctrinate young children into the
       concept that homosexuality and marriage between same-sex partners is moral and
       accepted, and that those who hold a faith such as the Parkers are incorrect in their beliefs.
       Essentially, the defendants are requiring the minor plaintiffs to affirm a belief inconsistent
       with and prohibited by their religion. Such indoctrination is inconsistent with the
       Parkers' sincere and deeply-held religious faith.

34.    As a result of these concerns, the Parkers decided to make a specific request of the
       Lexington Public Schools. On March 4, 2005, they wrote to the defendant Principal Jay,

                                              9

the defendant Mr. Ravenelle, the defendant Ms. Wolfrum, and the defendant Superintendent Hurley. The Parkers specifically requested that no teacher or adult expose their child to any materials or discussions featuring sexual orientation, same-sex unions, or homosexuality without notification to the Parkers and the right to "opt out."

35. Principal Jay responded on March 4, 2005 that it was the School's position that parents would not be notified of any discussions, even adult-initiated discussions, which dealt with gay-headed families, as such information was not included in the School's parental notification policy.

36. On March 6, 2005, the Parkers sent an email to Principal Jay of the Estabrook Elementary School and the Anti-Bias Committee requesting information. No one responded to it.

37. The Parkers were concerned by the tone of the February 8, 2005 Anti-Bias Committee meeting. For this reason, they attended more meetings; at one meeting, which occurred on April 11, 2005, it was announced that more homosexually-themed books would be placed in each classroom without parental notification. This greatly concerned the Parkers.

38. The Parkers asserted that the School's position was contrary to their religious views and parental rights to raise their children in accordance with their personal beliefs. They requested a meeting to discuss the matter in person with Principal Jay. Ms. Jay invited the Parkers to a meeting with herself and Andre Ravenelle, the Director of Education, to take place on April 27, 2005 at 3:00 p.m. at Estabrook Elementary School. At the meeting, the Parkers met with both Ms. Jay and Mr. Ravenelle. The meeting focused on the Parkers' interim need to have a plan in place for the remainder of the school year. A

10

handwritten agreement was drafted and faxed to the Superintendent's Office. Ms. Parker

left the meeting, while Mr. Parker remained. At some point, Mr. Parker was informed

that the School would not agree to any temporary plan, and the meeting was terminated.

Mr. Parker, frustrated by the turn of events, refused to leave the school and was arrested

for trespassing by the Lexington Police Department.

39.    Subsequently, the defendant Superintendent Hurley issued a no-trespassing order against

Mr. Parker, banning him from all school property. (In November 2005, the no-trespass

order was dismissed by the new Superintendent, the defendant Dr. Ash.)

40.    Following the arrest of Mr. Parker, Mr. Hurley, along with the Lexington Chief of Police

Christopher Casey, released a statement to the press and community that was sent home

with all Lexington Public School children in their book bags. It reads in full:

> At the request of Mr. and Mrs. Parker, a school principal and the Director of
> Curriculum and Instruction for the Lexington Public Schools ("Administrators")
> met with the Parkers on Wednesday, April 27, 2005, starting at approximately
> 3:00 p.m. The Administrators agreed to meet with the Parkers to consider their
> several requests, which appeared related to a picture book entitled "Who's in a
> Family?" The book was among several included in a "diversity book bag" that
> children in the Lexington Public Schools are permitted to take home for parents to
> read with their child if they wish. The book is designed for young children and
> includes illustrations of children accompanied by various parent figures, including
> two individuals of different genders, two individuals of the same gender,
> grandparents, bi-racial couples, as well as a one-parent family.
>
> In particular, the Parkers requested the Administrators to ensure that in the future,
> teachers automatically excuse or remove the Parkers' child even when discussions
> about such issues arise, even if spontaneously. In response, the Administrators
> described Lexington Public Schools' policy, adopted under state law (Chapter 71,
> Section 32A), allowing students to opt out of curriculum that "primarily involves
> human sexual education or human sexuality issues." The Administrators
> explained that granting the Parkers' request was not required by the Policy or
> statutory language. In addition, they explained that implementation of the
> Parkers' request was simply not practical, since children could even discuss such

11

matters among themselves at school.

The Administrators informed the Parkers that they could appeal the response both within the school department and, if necessary, to the Commissioner of Education. However, Mr. Parker replied, "Other people have tried that and it did not work." The Parkers stated that they would not leave the school until their demands were met.

With the hours passing and the Parkers refusing to leave the school building, the Lexington Police were notified. While Mrs. Parker chose to leave before police arrival, Mr. Parker did not. Two plain-clothed detectives arrived at 5:20 p.m., followed by a Police Lieutenant at 6:00 p.m. All attempted to coax Mr. Parker to leave voluntarily. However, Mr. Parker made it clear that he would not leave unless his demands were met and that he knew he was engaging in "civil disobedience" and was willing to accept the consequences. Mr. Parker declared, "If I'm not under arrest then I'm not leaving." Mr. Parker also used his cell phone to make a number of phone calls, and a small group of people began arriving with cameras.

Finally, when it became necessary for the administrative staff to leave and secure the building, the police arrested Mr. Parker at 6:24 p.m. The group with the video camera was waiting behind the police station and photographed Mr. Parker's arrival. Mr. Parker was processed at the police station, afforded all his rights, and after using the telephone, chose not to be bailed. He was held overnight at the Lexington Police Station and in the morning was transported to the Concord District Court for arraignment.

41. The defendant Scott Burson, an elected member of the Lexington School Committee, also commented publicly at the May 27, 2005 School Committee meeting that he was "particularly distressed at trying to turn our children into cannon fodder in the culture wars. They deserve better." While he did not specifically mention the Parker family, on information and belief, the comments were directed toward the Parkers and others.

42. During the current 2005 -2006 school year, the Parkers' oldest son Jacob is in the first grade at the Estabrook Elementary School. In September 2006, the second of the Parkers' children, Josh, is expected to begin kindergarten at Estabrook Elementary School. On

12

December 2, 2005, the Parkers again notified the Superintendent's Office of their request

via a Parental Right Assertion. They requested:

> to be notified when there are plans to discuss/present homosexuality,
> transgenderism, or gay relationships/marriage in our son's presence. When
> "spontaneous" adult discussion arises with the intent to affirm, validate, celebrate,
> and/or normalize homosexuality, transgenderism, or gay relationships/marriage –
> we request that our child be removed from this discussion. We request to also be
> notified in advance of any other planned human sexual education and human
> sexuality issues such as abortion, birth-control, pre-marital sex, or surveys. We
> also request to view any materials within the school pertaining to the
> aforementioned topics within the reach of our child.

43.    On or about September 22, 2005, the defendant Superintendent Ash issued a statement

that (on information and belief) was generated in part by the controversy surrounding the

plaintiffs' reasonable and constitutional requests. The statement reads, in its entirety:

**What does the law say schools have to do?**
**By Paul Ash**
**Superintendent of Schools, Lexington, MA**
**Published in the *Lexington Minuteman***
**Thursday, September 22, 2005**

Over the summer, I have received a number of questions about implementation of
Massachusetts General Laws, Chapter 71, Section 32A ("Section 32A"). These questions
relate to the following provision:

> Every city, town, regional school district or vocational school district
> implementing or maintaining curriculum which primarily involves human
> sexual education or human sexual issues shall adopt a policy ensuring
> parental/guardian notification. Such policy shall afford parents or guardians
> the flexibility to exempt their children from any portion of said curriculum
> through written notification to the school principal.

> In Lexington, curriculum identified by the statute generally begins at the fifth-
> grade level. LPS [Lexington Public Schools] has, of course, adopted a policy
> implementing Section 32A, and school staff routinely provide parents with notice
> and the flexibility to "opt out" of this curriculum.

13

Recently, questions have been raised as to whether school staff also has an obligation to notify parents and allow "opt out" of other school-based activities, particularly in the elementary grades. For example, some parents have requested they be notified whenever their child has access to any material, conversation, or activity that acknowledges differences in sexual orientation, including any reference to families with same-gender parents.

Since elementary curriculum often elicits discussion of family experiences, such references certainly may occur. In addition, our schools routinely provide students with access to materials, activities, and discussions that recognize diversity. This access is designed to assist us in our goal of maintaining an appropriate and respectful educational environment for all students. As required by law and LPS policy, this environment must be free of discrimination based on race, gender, color, religion, sexual orientation, national origin and disability.

The Massachusetts Department of Education, which is responsible for administering Section 32A, has explained that activities and materials designed to promote tolerance and respect for individuals, including recognition of differences in sexual orientation "without further instruction on the physical and sexual implications" do not trigger the notice and opt out provisions of Section 32A. Under this standard, staff has no obligation to notify parents of discussions, activities, or materials that simply reference same-gender parents or that otherwise recognize the existence of differences in sexual orientation. Accordingly, I expect teachers to continue to allow children access to such activities and materials to the extent appropriate to children's ages, to district goals of respecting diversity, and to the curriculum. As this new school year begins, I look forward to working with the Lexington community to provide a positive educational environment for all students.

44. This release is inaccurate and intentionally crafted to demean the Parkers' legitimate and

constitutional concerns. Specific problems are identified below:

A.    The language of the statute is quoted incorrectly. The actual language refers to

"human **sexuality** issues" not "human sexual issues."

B.    The phrase "In Lexington, curriculum identified by the statute begins in fifth

grade . . ." is self-serving and misleading. The statute does not identify any

14

specific curriculum. It refers to topics within the constitutionally established zone
of familial privacy.

C.   The phrase "some parents have requested they be notified whenever their child
has access to any material, conversation, or activity that acknowledges differences
in sexual orientation, including any reference to families with same-gender
parents," is clearly intended to refer to the plaintiffs and other like-minded Judeo-
Christians. It belittles their constitutional concerns by suggesting that the
plaintiffs wish to interfere or control playground banter, when, in fact, at all
pertinent times the plaintiffs explicitly expressed concern only with adult-initiated
indoctrination.

45.   In December 2005, the defendant Superintendent Ash formally rejected the Parkers'
request for notification.

46.   These actions caused the plaintiffs severe emotional distress.

47.   Young children of the ages of the two Parker children are far more susceptible to
indoctrination and persuasion than are children even a few years older.

48.   At all pertinent times, the actions of the defendants jointly and severally constituted "state
action" as that term is defined in the various counts below.

49.   There exists a true and justiciable conflict between the plaintiffs and the defendants,
which conflict is certain to continue such that declaratory relief may be granted.

## THE WIRTHLINS

50.   At all pertinent times, Joseph and Robin Wirthlin, the adult plaintiffs, were married to
one another. The adult plaintiffs are the natural parents of the plaintiff Joseph Robert

15

Wirthlin, Jr., "Joey," who was born on September 13, 1998.

51.   At all pertinent times, the minor plaintiff Joey was enrolled in the second grade at the
      aforesaid Estabrook Elementary School.

52.   Each week, the teacher chooses books to place on a particular bookshelf in the classroom.
      The children are supposed to read the books and determine the unifying theme of the
      books. The theme of the week ending March 24, 2006 was "weddings."

53.   On or about Friday, March 24, 2006, the teacher in Joey's class, defendant Heather
      Kramer, read out loud to the students from a book entitled King and King, which she had
      selected from the library. This book describes a romantic attraction between two men.
      The protagonist is a male prince who is told by his mother that he needs to find a wife.
      He rejects several females for superficial reasons such as the fact that one princess is
      "black" and has arms that are too long. One princess is too fat, and one has glasses and
      crooked teeth. He then discovers he is homosexual, falls in love and lives happily ever
      after with another homosexual male. The two males are graphically depicted as kissing at
      the end of the book.

54.   Like the Parkers, the Wirthlin plaintiffs are devout Judeo-Christians. Included in their
      core Judeo-Christian beliefs is the concept that issues pertaining to sexual intimacy,
      procreation, human sexuality, and the holy basis of matrimony should remain private
      within families, be introduced by parents, and governed by the laws of the God of
      Abraham. Also included is the concept that homosexual behavior is immoral in that it
      violates God's law.

55.   This theme of romantic physical contact between two men is not one that the Wirthlins

16

wish to have celebrated and affirmed to their young, seven-year-old son, because it is in contravention of their sincerely and deeply-held faith.

56. On information and belief, the defendant Ms. Kramer knew or should have known that reading King and King would be in direct contravention of the deeply-held faith of the Wirthlins and possibly others. On information and belief, Ms. Kramer selected King and King to read to the students for the express purpose of indoctrinating them into the concept that homosexuality and marriage between same-sex partners is moral. In so doing, she consciously intended to intrude upon the Wirthlins' right to direct the moral upbringing of their own children.

57. The evening of the reading, Joey returned home and was agitated. He told his parents about the book, which he described as "so silly."

58. The Wirthlins then sent an email to Ms. Kramer, and requested clarification. Ms. Kramer telephoned them on Monday, March 27, 2006, confirming the book had been read, and told them the name of the book.

59. On March 30, 2006, the Wirthlins attended a previously scheduled parent-teacher conference with Ms. Kramer. The book was not discussed.

60. Later that same day, the Wirthlins emailed Ms. Kramer specifically to arrange a meeting to discuss the book. A meeting for the next day was arranged.

61. On March 31, 2006, Ms. Kramer called in the morning and asked to postpone the meeting and to choose a different time to meet. Additional emails were exchanged and a new meeting was set for April 6, 2006. She also asked what the topic of the meeting would be. The Wirthlins indicated they had additional concerns and wanted to discuss the book

17

that was read.

62.     On or about April 5, 2006, the Wirthlins received a telephone call from the defendant

Principal Jay. Ms. Jay asked them who they were bringing, besides themselves, to the

scheduled meeting, and informed the Wirthlins that she intended to be present. She also

inquired as to the intended outcome.

63.     On April 6, 2006, the meeting took place. Principal Jay presented the plaintiffs with the

letter Dr. Ash had previously written. (See paragraph 43, supra.) She took the position

that allowing second-graders to view the book King and King was consistent with Dr.

Ash's statement. Ms. Jay was cordial but unwilling to bend at all on the issue of notice.

Essentially, she reiterated Dr. Ash's statement and indicated that it was the only policy

that would be considered.

64.     On or about April 11, 2006, the Wirthlins received an email from the defendant Principal

Jay stating that their concerns were at a "district-wide level" and that she would not be

able to answer them.

65.     At the meeting on April 6, 2006, the Wirthlins repeatedly requested that they be informed

before the adult defendants intentionally presented themes of homosexuality to their

children. The defendants have indicated that they will not do so; to the precise contrary,

the defendants intend to persist in presenting themes of romantic homosexual activity to

second-graders.

66.     On information and belief, the reason why the defendants will not inform the Wirthlins is

that the defendants' specific intention is to coercively indoctrinate the children into moral

belief systems that are markedly different from those of their parents, and the defendants

18

harbor a specific intention to denigrate the Wirthlins' sincere and deeply-held faith. The

Wirthlins wish to direct the personal moral and religious views of their own children and

believe these children are too young, at ages seven and eight to be able to comprehend the

complexities of such a controversial and advanced topic.

67. On or about April 13, 2006, the plaintiff Robin Wirthlin encountered the defendant Ms.

Jay in the Wirthlins' daughter's classroom. RobinWirthlin asked Ms. Jay why she would

not further discuss the issues, and again sought to discuss the issues with Principal Jay.

Ms. Jay refused to discuss the issues with the Wirthlins, and stated that she had been

instructed by Dr. Ash not to speak with the Wirthlins about these issues.

68. The conduct of Ms. Jay and Dr. Ash is the direct implementation of an unconstitutional

policy planned and conducted by themselves and the other co-defendants.

69. There exists a true and justiciable conflict between the plaintiffs and the defendants,

which conflict is certain to continue such that declaratory relief may be granted.

## COUNT I:
## 42 U.S.C. § 1983/DUE PROCESS VIOLATION

### UNREASONABLE INTRUSION INTO HYBRID
### RIGHTS TO DIRECT MORAL UPBRINGING OF CHILDREN
### FAMILIAL PRIVACY, AND FREE EXERCISE OF RELIGION

70. The plaintiffs repeat and reallege each and every allegation set forth in the above-

captioned paragraphs and incorporate them by reference as if fully and completely set

forth herein.

71. The aforesaid acts of the defendants intruded upon and impaired the adult plaintiffs'

clearly established substantive due process rights under the Fifth and Fourteenth

19

Amendments, as parents and guardians to direct the moral upbringing of their children, and the clearly established rights of the minor children to such upbringing.

72.     The aforesaid actions of the defendants constituted an unreasonable intrusion into the familial privacy rights of the respective plaintiffs in violation of the plaintiffs' clearly established rights under the Fourth and Fourteenth Amendments, and otherwise invaded and impaired the plaintiffs' clearly established rights to privacy under the Fourth, Fifth, and Fourteenth Amendments.

73.     The aforesaid actions of the defendants invaded and impaired the plaintiffs' clearly established rights to the free exercise of their religion.

74.     The combined effect of these deprivations is synergistic and requires the state to set forth a compelling state interest in its conduct. There is no compelling state interest in persisting in the indoctrination techniques being utilized by the defendants.

75.     As a direct result of said unlawful acts, the plaintiffs sustained great damages.

76.     Pursuant to 42 U.S.C. § 1988, plaintiffs are entitled to attorney's fees and expert fees in connection with the bringing of the claims alleged in this count.

## COUNT II:
## MASSACHUSETTS CIVIL RIGHTS ACT

77.     The plaintiffs repeat and reallege each and every allegation set forth in the above captioned paragraphs and incorporate them by reference as if fully and completely set forth herein.

78.     By engaging in the conduct described above, including threats, intimidation and coercion, the defendants interfered with and deprived the plaintiffs of their exercise and enjoyment

20

of their civil rights secured under the constitution and laws of the Commonwealth of

Massachusetts, in violation of Massachusetts General Laws Chapter 12, § 11I.

79.     As a direct and proximate result of the defendants' violations of Mass. Gen. Laws ch. 12,

§ 11I, the plaintiffs suffered the injuries described above.

## COUNT III:
## MASSACHUSETTS "OPT OUT" STATUTE

80.     The plaintiffs repeat and reallege each and every allegation set forth in the above

captioned paragraphs and incorporate them by reference as if fully and completely set

forth herein.

81.     Massachusetts General Laws Chapter 71, § 32A reads as follows:

§ 32A. Parental Notification of Human Sexual Education Curriculum.

Every city, town, regional school district or vocational school district implementing or
maintaining curriculum which primarily involves human sexual education or human
sexuality issues shall adopt a policy ensuring parental/guardian notification. Such policy
shall afford parents or guardians the flexibility to exempt their children from any portion
of said curriculum through written notification to the school principal. No child so
exempted shall be penalized by reason of such exemption.

Said policy shall be in writing, formally adopted by the school committee as a school
district policy and distributed by September first, nineteen hundred and ninety-seven, and
each year thereafter to each principal in the district. A copy of each school district's
policy must be sent to the department of education after adoption.

To the extent practicable, program instruction materials for said curricula shall be made
reasonably accessible to parents, guardians, educators, school administrators, and others
for inspection and review.

The department of education shall promulgate regulations for adjudicatory proceedings to
resolve any and all disputes arising under this section.

82.     The Town of Lexington has begun a program intended primarily to indoctrinate very

young elementary school children in the notion that homosexuality and homosexual

21

relationships and marriage are right and moral.

83.   Pursuant to Mass. Gen. Laws ch. 71 § 32A, the plaintiffs have the right to be notified and
      to excuse their children from this curriculum.

84.   The defendants have breached this right and by said breach have caused the plaintiffs
      great damage.

## COUNT IV:
## CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983

85.   The plaintiffs repeat and reassert the allegations contained in the above paragraphs and
      incorporate them by reference as if fully and completely set forth herein.

86.   By having engaged in the conduct described above, the defendants conspired to deprive
      the plaintiffs of their due process rights and their rights to equal protection of the law or
      of the equal privileges and immunities under the law, and they acted in furtherance of the
      conspiracy which resulted in the injury to the plaintiffs as described above, all in violation
      of 42 U.S.C. § 1983.


      WHEREFORE, plaintiffs, jointly and severally, respectfully request this honorable court :

1.    Pursuant to 28 U.S.C. § 2201, to declare and rule that there exists a justiciable
      controversy between the plaintiffs and the defendants;

2.    Pursuant to 28 U.S.C. § 2201, to issue a declaratory judgment declaring that each
      defendant has violated each of the plaintiffs' constitutional rights of due process as set
      forth above;

3.    Order equitable and injunctive relief ordering that:

A. The plaintiff parents be expressly and clearly notified prior to any adult-directed or initiated classroom discussions of sexuality, gender identity, and marriage constructs, until such time as the children are in seventh grade. Such notification must be explicit about the content, given in a timely manner, and involve the written consent of parents to opt children into these presentations/discussions.

B. The plaintiff parents be presented with an opportunity to excuse the children from classroom presentations or discussions the intent of which is to have children accept the validity of, embrace, affirm, or celebrate views of human sexuality, gender identity, and marriage constructs.

C. The plaintiff parents be presented with an opportunity to excuse the children from classroom presentations or discussions when the intent is to have children accept the validity of, embrace, affirm or celebrate belief systems or religious perspectives.

D. The plaintiff parents be presented with an opportunity to attend, as silent observers, and record any school presentations or discussions of the aforementioned ideological/socialization perspectives.

E. That no materials graphically depicting homosexual physical contact be submitted to the students until the seventh grade, with the provisions of Sections 3A and 3C.

4. Order payment of compensatory damages to the fullest extent allowed by law;

5. Order payment of special, exemplary, or punitive damages, to the fullest extent allowed by law;

6. Order payment of attorney's fees, expert fees, prejudgment interest, interest, costs and;

23

7.    Provide such additional relief as the court deems just.

## **JURY DEMAND**

PLAINTIFFS RESPECTFULLY REQUEST A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

RESPECTFULLY SUBMITTED,
PLAINTIFFS

By their attorneys,

Jeffrey A. Denner, Esq., BBO No. 120520
Neil S. Tassel, Esq., BBO No. 557943
Robert S. Sinsheimer, Esq., BBO No. 464940
DENNER ASSOCIATES, P.C.
Four Longfellow Place, Suite 3501-06
Boston, MA 02114
(617) 227-2800

Dated: April 27, 2006

24