UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DAVID PARKER, et al, Plaintiffs, | ) | |
| vs. | ) | CIVIL ACTION NO. 06-10751-MLW |
| WILLIAM HURLEY, et al, Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

This Complaint against public school officials and the Town of Lexington arises from alleged grievances of two sets of parents who object to even the most minimal references to gay and lesbian families found in a few books made available to their young children. Neither the incidental exposure of plaintiffs' children to such materials, nor broader school policies promoting acceptance of diversity and elimination of discrimination against minorities, including gays and lesbians, are grounds to support the constitutional and statutory claims advanced by the plaintiffs. Moreover, neither this Court nor other courts throughout the country have recognized constitutional claims that would entitle individual parents to control the flow of information and the curriculum of public schools, or to censor material inconsistent with their religious beliefs. Accordingly, the defendants move to dismiss this Complaint.

Plaintiffs' Complaint sounds in four Counts. In Count I, the plaintiffs seek relief under 42 U.S.C. § 1983 for defendants' alleged "unreasonable intrusion" into plaintiffs' "hybrid rights to direct [the] moral upbringing of [their] children." In Count II, the plaintiffs claim that defendants' alleged interference with their constitutional rights was accomplished through "threats, intimidation and coercion" and is, therefore, actionable under M.G.L. c. 12, §§ 11H &

11I, the Massachusetts Civil Rights Act. In Count III, the plaintiffs seek to invoke a private right of action under M.G.L. c. 71, § 32A, the so-called "Opt-out Statute," a parental notification law adopted by the Massachusetts Legislature in 1996. Finally, in Count IV, the plaintiffs allege that the defendants conspired to deprive them of their constitutional rights in violation of 42 U.S.C. § 1983. In relief, the plaintiffs seek both compensatory and punitive damages, as well as injunctive relief in the form of an order requiring defendants to give the plaintiff parents "explicit" and "timely" prior notice of future adult-directed or initiated classroom discussions of "sexuality, gender identity, [or] marriage constructs . . .," and further requiring that plaintiff parents be given the opportunity to excuse their children from future classroom presentations or discussions involving the "validity," "affirm[ation]" or "celebrat[ion]" of "human sexuality, gender identity, . . . marriage constructs . . ., belief systems or religious perspectives."[1]

The defendants, William Hurley; Paul B. Ash, Ph.D.; Helen Lutton Cohen; Thomas R. Diaz; Olga Guttag; Scott Burson; Thomas Griffith; Andre Ravenelle; Joni Jay; Jennifer Wolfrum; Heather Kramer;[2] and the Town of Lexington; now move to dismiss plaintiffs' Complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. As grounds therefor, the defendants state:

1. Defendants' use of the reading materials identified in plaintiffs' Complaint did not unreasonably interfere with or place an unlawful burden on plaintiffs' constitutional rights;

---

[1] Id., [Prayer for Relief], ¶ 3.

[2] Mr. Hurley is the former Superintendent of the Lexington Public Schools. Dr. Ash is the current Superintendent. Ms. Cohen, Mr. Diaz, Ms. Guttag, Mr. Burson and Mr. Griffith are members of the Lexington School Committee. Mr. Ravenelle is the former Director of Education. Ms. Jay is the former Principal of Estabrook Elementary School. Ms. Wolfrum is the Coordinator of Health Education. Ms. Kramer was the second grade teacher of the minor plaintiff, Joey Wirthlin, during the 2005-2006 academic year. The eleven (11) individual defendants are sued both individually and in their official capacities.

moreover, defendants' legitimate governmental interest in providing an appropriate public education to all school-age children within the Town of Lexington outweighs plaintiffs' rights to tailor the public school curriculum to suit their personal morals or beliefs, to dictate how or when certain subjects may be taught to their children, or to control the flow of age-appropriate information regarding diversity or family composition, including same sex parents.

2. Defendants did not unlawfully interfere with plaintiffs' constitutional rights through "threats, intimidation or coercion" and, therefore, no claim lies under the Massachusetts Civil Rights Act.

3. The Massachusetts Opt-out Statute does not create a private right of action enforceable by the plaintiffs.

4. The plaintiffs fail to state a viable conspiracy claim under 42 U.S.C. § 1983.

5. The individual defendants are entitled to qualified immunity as against plaintiffs' civil rights claims.

Because the plaintiffs fail to state a claim upon which relief can be granted, all four Counts of their Complaint must be dismissed. This Memorandum of Law is submitted in support of the defendants' Motion to Dismiss.

## I. STANDARD OF REVIEW

When ruling on a Rule 12(b)(6) motion, the Court must accept as true all well-pleaded facts in the Complaint, construe such facts in the light most favorable to the plaintiffs, and then determine whether the Complaint sets forth any set of facts which could entitle the plaintiffs to relief. Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999); Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir. 1988). Nevertheless, the Court must "eschew any reliance on

bold assertions, unsupportable conclusions and 'opprobrious epithets.'" Chongris v. Board of Appeals of the Town of Andover, 811 F.2d 36, 37 (1st Cir. 1987). Further, the Court is not obliged to honor subjective characterizations, optimistic predictions or problematic suppositions. Dartmouth Review v. Dartmouth College, 889 F.2d 13, 16 (1st Cir. 1989).

## II. PLAINTIFFS' COMPLAINT

The plaintiffs, David and Tonia Parker, are the parents of Jacob and Joshua Parker. The Parkers describe themselves as "devout Judeo-Christians"[3] who sincerely believe that marriage is a union between a man and a woman *only*, and "that labeling marriage to be otherwise is immoral."[4] In September 2004, the Parkers enrolled Jacob in kindergarten at Estabrook Elementary School (hereinafter "Estabrook"), a public school in the Town of Lexington.[5] According to the Parkers, the defendants immediately began instructing Jacob contrary to his family's religious beliefs.[6] In support of this allegation, the Parkers cite two books to which their son was exposed while attending Estabrook. During his kindergarten year, Jacob brought home Who's In A Family, a book which appeared to depict same sex couples together with children.[7] The book was one of several contained in a "Diversity Book Bag" that was "intended to strengthen the connections among our school population and build an atmosphere of tolerance and respect for cultural racial ability and family structure diversity."[8] The following year, Jacob

---

[3] Id., ¶ 23.
[4] Id., ¶ 28.
[5] Id., ¶ 24.
[6] Id., ¶ 25.
[7] Id., ¶ 26.
[8] Id. In a statement sent home to parents sometime after April 27, 2005, the defendant, former Superintendent Hurley, described Who's In A Family as follows:

> The book is designed for young children and includes illustrations of children accompanied by various

(then in first grade) was also exposed to Molly's Family, a book which likewise depicted "gay and lesbian relationships and gay and lesbian marriage."[9] The Parkers contend that Who's In A Family and Molly's Family address homosexuality and transgenderism,[10] subjects of "great concern" to them,[11] and they were given neither prior notice of the school's intended use of such materials, nor the opportunity for their son to opt-out from that portion of the curriculum.[12]

The plaintiffs, Joseph and Robin Wirthlin, are the parents of Joey Wirthlin. The Wirthlins, like the Parkers, describe themselves as "devout Judeo-Christians."[13] Among the Wirthlins' "core beliefs" is the concept that issues concerning sexual intimacy and the holy basis of matrimony are governed by the laws of the God of Abraham and should remain private within the family. Included in that concept is the belief that homosexual behavior "is immoral in that it violates God's law."[14] During the 2005-2006 academic year, Joey was enrolled in the defendant, Heather Kramer's, second grade class at Estabrook. On March 24, 2006, Ms. Kramer read aloud to the class (including Joey) King and King, a library book. According to the Wirthlins, the theme of King and King is one of "romantic physical contact between two men."[15] In Paragraph 53 of the Complaint, the plaintiffs summarize the book as follows:

---

parent figures, including two individuals of difference genders, two individuals of the same gender, grandparents, bi-racial couples, as well as a one-parent family.

Id., ¶ 40.

[9] Id., ¶ 27.

[10] A transgender individual is one who experiences "a strong and persistent cross-gender identification," as well as "persistent discomfort about one's assigned sex or a sense of inappropriateness in the gender role of that sex." Diagnostic and Statistical Manual of Mental Disorders (4th Ed. 1994), at 532-533. The defendants dispute that "Who's In A Family" or "Molly's Family" address issues of transgenderism, and certainly the Parkers identify no transgender characters who appear in either book.

[11] Id., ¶¶ 28, 29 & 31.

[12] Id., ¶¶ 27 & 34.

[13] Id., ¶ 54.

[14] Id.

> This book describes a male prince who is told by his mother that he needs to find a wife. He rejects several females for superficial reasons such as the fact that one princess is "black" and has arms that are too long. One princess is too fat, and one has glasses and crooked teeth. He then discovers he is homosexual, falls in love and lives happily ever after with another homosexual male. The two males are graphically depicted as kissing at the end of the book.[16]

The Wirthlins contend that Ms. Kramer read King and King to her students for the "express purpose" of teaching them, contrary to the Wirthlins' "deeply-held faith," that homosexuality and marriage between same-sex partners is moral.[17] Such instruction, the Wirthlins claim, intrudes upon their right to "direct the moral upbringing of their own children."[18] Moreover, the Wirthlins, like the Parkers, were not given prior notice of the school's use of the book King and King, nor the opportunity to excuse their son from that portion of the curriculum.

The plaintiffs allege that inclusion of the above-referenced books in the Elementary School curriculum is part of an unconstitutional policy of coercive indoctrination planned and adopted by the defendants. As characterized by the plaintiffs, the defendants' plan is to teach their children "moral belief systems that are markedly different from those of their parents" with the specific intent to "denigrate" the plaintiffs' sincere and deeply-held beliefs.[19] Such a policy, plaintiffs claim, is unconstitutional and, therefore, must be stricken.

## III. ARGUMENT

Before addressing the several grounds for the dismissal of plaintiffs' Complaint, it is appropriate for the Court first to examine plaintiffs' claims in the context of their full Complaint

---

15 Id., ¶ 55.

16 Id., ¶ 53. The so-called "graphic" depiction is nothing more than the Wirthlins' subjective characterization which this Court need not honor on a motion to dismiss. A copy of the illustration from the last page of King and King is attached hereto as "A."

17 Id., ¶¶ 55 & 56.

18 Id., ¶ 56.

and in light of Massachusetts public education law. Yet in so doing, the Court should be mindful that its role in reviewing the administration of public education is limited. "Public education of children is unquestionably entrusted to the control, management, and discretion of state and local school committees." Curtis v. School Comm. of Falmouth, 420 Mass. 749, 754 (1995). "Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." Id., quoting Epperson v. Arkansas, 393 U.S. 97, 104 (1968).

Among plaintiffs' well-pleaded facts, the Parkers and Wirthlins quote at length a statement issued by the defendant, Superintendent Ash, on or about September 22, 2005. In that statement, Superintendent Ash wrote, in part:

> [O]ur schools routinely provide students with access to materials, activities, and discussions that recognize diversity. This access is designed to assist us in our goal of maintaining an appropriate and respectful educational environment for all students. As required by law and LPS [Lexington Public School] policy, this environment must be free of discrimination based on race, gender, color, religion, sexual orientation, national origin and disability.[20]

Consistent with this policy, the defendants distributed to kindergarten students (including Jacob) a "Diversity Book Bag." In so doing, defendants' "goal" was not to "denigrate" plaintiffs' beliefs but, rather, to "engage the student and parent population in a sustained effort of acknowledging and celebrating the diverse backgrounds and families in our school community."[21]

This "goal" is not unique to the Town of Lexington. Indeed, the acknowledgment and

---

[19] Id., ¶ 66.

[20] Id., ¶ 43. M.G.L. c. 76, § 5, expressly prohibits public schools from excluding or discriminating against any student "on account of race, color, sex, religion, national origin or sexual orientation."

[21] Complaint, ¶ 26.

celebration of diversity is a goal embraced by the entire Commonwealth.[22] In the Massachusetts Comprehensive Health Curriculum Framework developed by the Commissioner of Education after enactment of the Education Reform Act of 1993 (M.G.L. c. 71, §§ 1, *et seq.*), the Commissioner adopted five Guiding Principles, as well as several educational Strands and Learning Standards, to assist school districts throughout the Commonwealth in providing age-appropriate health education for students in grade levels pre-kindergarten through twelve.[23] Hancock v. Commissioner of Ed., 443 Mass. 428, 438-439 (2005); Student No. 9 v. Board of Ed., 440 Mass. 752, 755-759 (2004). Guiding Principle IV recognizes that a comprehensive health education program contributes to the capacity of students to work in their community to "create a safe and supportive environment where individual similarities and differences are acknowledged."[24] As mandated by the Commonwealth, health education begins in the early grades. Thus, for the Strands set forth below, the Commissioner recommends that, by the completion of grade five, students should receive instruction in accordance with the following Learning Standards:

[22] In fact, teaching diversity and tolerance is regarded as a national educational goal. As the Supreme Court noted, public schools serve the purpose of teaching fundamental values "essential to a democratic society." Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 681 (1986). These values "include tolerance of divergent political and religious views" while taking into account "consideration of the sensibilities of others." Id.

[23] M.G.L. c. 69, § 1D, states that the Board of Education shall direct the Commissioner to develop "academic standards" for certain core subjects concerning grades kindergarten through twelve. These standards shall, among other things, "be designed to inculcate respect for the cultural, ethnic and racial diversity of the commonwealth . . .," and "may also include the teaching of family life skills . . .." Id. Furthermore, such academic standards "shall be designed to avoid perpetuating gender, cultural or racial stereotypes." Id. Pursuant to M.G.L. c. 69, § 1E, the Board shall also direct the Commissioner to adopt "curriculum frameworks" for core subjects covered by the academic standards. And, like the standards themselves, said frameworks "shall be designed to avoid perpetuating gender, cultural, ethnic or racial stereotypes." Id.

[24] For the convenience of the Court, copies of selected portions of the Massachusetts Comprehensive Health Curriculum Framework are attached hereto as "B."

| *Strand* | *Learning Standard*[25] |
| --- | --- |
| *Reproduction/Sexuality* | *Define sexual orientation using the correct terminology (such as heterosexual, and gay and lesbian).* |
| *Family Life* | *Describe different types of families, addressing membership and social influences, and the functions of family members.* |
| *Interpersonal Relationships* | *Describe the concepts of prejudice and discrimination.* |

The plaintiffs recognize (as they must) that Massachusetts endorses marriage between same-sex couples. See Goodridge v. Department of Public Health, 440 Mass. 309 (2003). Nonetheless, they do not wish their children to learn of this subject at their current ages.[26] Although mindful of this personal preference, the defendants violated no constitutional or statutory rights of the plaintiffs by making available the books Who's In A Family, Molly's Family and King and King to Elementary School students.

**A. Defendants' Use of the Identified Reading Materials in the Elementary School Did Not Violate Plaintiffs' Constitutional Rights.**

In Count I of their Complaint, the plaintiffs allege the defendants violated their free exercise of religion rights, their rights to direct the upbringing of their children, and their substantive due process rights, all as protected under the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution. The plaintiffs describe such rights as "hybrid rights" in that "the combined effect of these deprivations is synergistic and requires the state to

---

[25] Academic standards "set forth the skills, competencies and knowledge expected to be possessed by all students at the conclusion of individual grades or clusters of grades." M.G.L. c. 69, § 1D.

[26] Complaint, ¶ 29.

set forth a compelling state interest in its conduct."[27] Plaintiffs' conclusion is in error; defendants' conduct need not satisfy a strict scrutiny test in order to pass constitutional muster. And, because defendants' inclusion of the three identified books made available to Elementary School students was rationally-related to the state's legitimate interest in exposing students to diversity in a respectful educational environment free from discrimination based on race, gender, color, religion, sexual orientation or disability, any burden placed on plaintiffs' rights, whether viewed alone or in combination, was not unconstitutional.

In Employment Div., Dep't of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990), the Supreme Court upheld the constitutionality of a neutral, generally applicable criminal law prohibiting the use of peyote in the face of plaintiff's challenge that it violated his right to the free exercise of religion. In applying a rational basis test – i.e., determining whether the law was reasonably related to a legitimate state interest – the Court noted that plaintiff's free exercise claim was not joined or combined with other constitutional protections, such as communicative activity or parental rights. Id., 494 U.S. at 882. In so doing, the Court implied (but did not hold) that such "hybrid situations" might merit a higher standard than rational basis review. Id.[28] Yet, the Court was careful to warn that the mere accompaniment of religious convictions would not

---

[27] Complaint, ¶ 74.

[28] The defendants do not concede that so-called "hybrid situations" necessarily merit a higher level of constitutional scrutiny. As the Second Circuit reasoned in Leebaert v. Harrington, 332 F.3d 134, 144 (2d Cir. 2003): "We . . . can think of no good reason for the standard of review to vary simply with the number of constitutional rights that the plaintiff asserts have been violated." See also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 567 (1993) (Justice Souter, in concurring opinion, criticizes "hybrid" exception as "untenable"); Henderson v. Kennedy, 253 F.3d 12, 19 (D.C. Cir. 2001) (court rejects notion that combination of two untenable claims can equal one tenable claim). Although debate is still brewing among the circuits regarding the existence and application of a "hybrid rights" exception, the defendants acknowledge that the First Circuit has held that the exception can be invoked where a plaintiff joins a free exercise challenge with another independently viable constitutional claim. Brown v. Hot, Sexy and Safer Prods., Inc., 68 F.3d 525, 539 (1st Cir. 1995), cert. den., 516 U.S. 1159 (1996).

shield otherwise proscribed conduct from governmental regulation. Id.

1. *Free Exercise of Religion*

Defendants' use of diversity materials in the Elementary School curriculum did not violate plaintiffs' rights to the free exercise of their Judeo-Christian beliefs. "As a general proposition, a law (or policy) that is neutral and of general applicability need not be justified by a compelling governmental interest even if that law incidentally burdens a particular religious practice or belief." Swanson v. Guthrie Ind. School Dist. No. 1-L, 135 F.3d 694, 697-698 (10th Cir. 1998), citing Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993). Absent a showing that the plaintiff was either forced by the state to affirm or deny a belief, or forced to engage or refrain from engaging in a practice prohibited (or mandated) by his or her religion, a free exercise claim will not be sustained. Mozert v. Hawkins Cty. Board of Ed., 827 F.2d 1058, 1065 (6th Cir. 1987), cert. den., 484 U.S. 1066 (1988).

Courts have routinely upheld the rights of public schools to adopt educational policies and design curriculum free of parental controls. See Mozert, 827 F.2d at 1065 (school's use of teaching materials concerning evolution, secular humanism, futuristic supernaturalism, pacifism, magic, mental telepathy and "false views of death," considered offensive to plaintiffs' religious beliefs, held constitutional); Fleischfresser v. Directors of School Dist. 200, 15 F.3d 680, 689-690 (7th Cir. 1994) (court dismissed parents' claims that elementary school reading program indoctrinated children in values "directly opposed to their Christian beliefs"); Grove v. Mead School Dist. No. 354, 753 F.2d 1528, 1533 (9th Cir. 1985) (school's inclusion of The Learning Tree, a book about secular humanism, in tenth grade curriculum, held constitutional); Hansen v. Ann Arbor Public Schools, 293 F. Supp. 2d 780, 808-809 (E.D. Mich. 2003) (high school panel

of clergymen espousing tolerance of homosexuality during diversity week held not violative of plaintiff's free exercise of Christian beliefs).

Neither the Parkers nor the Wirthlins were compelled to disavow their beliefs that same-sex marriage is immoral and against God's law by virtue of the three books included among the Elementary School reading materials. In support of their free exercise claim, the Parkers allege that the subjects addressed in Who's In A Family and Molly's Family are of "great concern" to them and "not consistent" with their own religious beliefs. Further, "they do not wish to discuss the topic of homosexual marriage or homosexuality" with their children at their current ages.[29] The Wirthlins similarly allege that the "theme of romantic physical contact between two men [presumably as addressed in King and King] is not one that [they] wish to have celebrated and affirmed to their young, seven-year-old son . . .." In addition, the Wirthlins "wish to direct the personal moral and religious views of their own children" and believe that their son is "too young . . . to be able to comprehend the complexities of such a controversial and advanced topic."[30]

While such "concerns" and "wishes" may be based on plaintiffs' genuine religious beliefs, defendants' use of diversity reading materials did not threaten the plaintiffs' "entire way of life." The Parkers and Wirthlins are still free to raise their children as they see fit, consistent with their own moral and religious beliefs. Thus, as the First Circuit noted in Brown, 68 F.3d at 539, plaintiffs' free exercise claim is "qualitatively different" from the type of claim the Supreme Court protected in Wisconsin v. Yoder, 406 U.S. 205, 235 (1972), where enforcement of the state's compulsory school attendance law jeopardized the very survival of Amish society. By

---

[29] Complaint, ¶ 28.

[30] Id., ¶¶ 55 & 66.

comparison, any incidental burden placed on the Parkers and Wirthlins by the use of books acknowledging diversity in sexual orientation did not violate their First Amendment rights. The mere exposure of their children to beliefs inconsistent with their own did not unduly burden plaintiffs' free exercise of religion. See Curtis, 420 Mass. at 758 (exposure to condom vending machines and condom distribution policy held not an unconstitutional violation of parental liberties, despite claims that programs offended plaintiffs' moral and religious sensibilities).

*2. Parents' Rights to Direct the Upbringing of Their Children*

Nor did defendants' use of diversity materials violate plaintiffs' rights to direct the upbringing of their children or to educate them in accordance with their views. The Supreme Court has recognized "a fundamental right of parents to make decisions concerning the care, custody and control of their children." Troxel v. Granville, 530 U.S. 57, 66 (2000). But while the right of parents to direct the upbringing of their children extends to public schools, it is not unqualified.

> The critical point is this: While parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child. Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or . . . a dress code, these issues of public education are generally "committed to the control of state and local authorities."

Blau v. Fort Thomas Public School Dist., 401 F.3d 381, 395-396 (6th Cir. 2005) (emphasis in original), quoting Goss v. Lopez, 419 U.S. 565, 578 (1975).

This was the precise holding of the First Circuit Court of Appeals in Brown v. Hot, Sexy and Safer Prods., Inc., 68 F.3d 525 (1st Cir. 1995), cert. den., 516 U.S. 1159 (1996), decided four years before Troxel. Brown involved an action brought against public school officials and others

by two students and their parents who objected to the students' compelled attendance at a sexually-explicit AIDS awareness program on the grounds that such attendance violated their substantive due process and privacy rights. After the District Court's dismissal of the complaint for failure to state a claim upon which relief could be granted, the plaintiffs appealed. The First Circuit affirmed. Recognizing that the Fourteenth Amendment protected the parents' rights to direct the upbringing of their children, the Court concluded, nonetheless, that such rights were not violated by the defendants, even if they *were* fundamental (as the Supreme Court later decided.) Id., 68 F.3d at 533. Although parents have a right to choose a specific educational program for their children – whether religious instruction at a private school or foreign language instruction – they do not have a right, ruled the First Circuit, "to dictate the curriculum at the public school to which they have chosen to send their children." Id.

> If all parents had a fundamental constitutional right to dictate individually what the schools teach their children, the schools would be forced to cater a curriculum for each student whose parents had genuine moral disagreements with the school's choice of subject matter. We cannot see that the Constitution imposes such a burden on state educational systems ....

Id., 68 F.3d at 534.

Numerous courts have followed Brown, even after the Troxel decision. See, e.g., Fields v. Palmdale School Dist. (PSD), 427 F.3d 1197, 1207 (9th Cir. 2005) (parents' right to direct child's upbringing "does not extend beyond the threshold of the school door"); Blau, 401 F.3d at 395-396 (parents' right does not allow father to except child from school dress code); Pisacane v. Desjardins, 2004 WL 2339204 (1st Cir. 2004) (unpublished) (parents' right does not allow parents to dictate to public school officials regarding use of science textbook); Morrison v. Board of Ed. of Boyd Cty., Ky., 419 F. Supp. 2d 937, 945-946 (E.D. Ky. 2006) (parents' right not

infringed by mandatory diversity training); Hansen, 293 F. Supp. 2d at 813 (parents' right not infringed by diversity week program regarding homosexuality).

The plaintiffs here are attempting to do precisely what the First Circuit ruled they have no right to do – dictate the content of the Elementary School curriculum to the defendants and, further, dictate *when* such material may be taught. Plaintiffs' right to direct the upbringing of their children does not extend so far. See Myers v. Loudoun Cty. School Bd., 251 F. Supp. 2d 1262, 1275-1276 (E.D. Va. 2003), aff'd, 418 F.3d 395 (4th Cir. 2005) ("[T]he fundamental right to raise one's children as one sees fit is not broad enough to encompass the right to re-draft a public school curriculum.")

*3. Substantive Due Process*

Nor did defendants' use of diversity materials violate plaintiffs' substantive due process right to be free from conduct that "shocks the conscience." In Brown, the First Circuit pointed out that it has found "conscience shocking" behavior, as prohibited by the Fourteenth Amendment, "only where the state actors engaged in 'extreme or intrusive physical conduct.'" 68 F.3d at 531, quoting Souza v. Pina, 53 F.3d 423, 427 (1st Cir. 1995). Yet, the threshold for alleging such claims is "high," in that the defendants' alleged acts must approach something akin to "mean-spirited brutality." Id., at 532. This threshold was not met in Brown, where the defendants' failure to provide opt-out procedures for students not wishing to attend a "sexually explicit AIDS awareness assembly" at school may have "displayed a certain callousness towards the sensibilities of minors," but was not otherwise "conscience shocking." Id. If the sexually explicit AIDS awareness assembly challenged in Brown did not meet the test of "mean-spirited brutality," then surely the exposure of plaintiffs' children to three simple story books cannot

shock the conscience as a matter of law. Thus, the defendants' alleged conduct was not so "conscience shocking" as to merit constitutional protection. See Chongris, 811 F.2d at 43 (bad faith violation of state law by municipal officials held insufficient to support substantive due process claim).

*4. "Hybrid Rights"*

As set forth above, the plaintiffs contend that the synergism between their free exercise rights, their right to direct the upbringing of their children, and their substantive due process rights, lends constitutional protection to the combination, even though each right *on its own* may not be so protected. In short, plaintiffs maintain that their claim presents a "hybrid situation," requiring strict scrutiny of the defendants' policy. To assert a "hybrid rights" claim, "a free exercise plaintiff must make out a colorable claim that a companion right has been violated – that is, a fair probability or a likelihood, but not a certitude, of success on the merits." Miller v. Reed, 176 F.3d 1202, 1207 (9th Cir. 1999). See Harper v. Poway Unified School Dist., 445 F.3d 1166, 1187 (9th Cir. 2006); Green v. City of Philadelphia, 2004 WL 1170531, at *7 (E.D.Pa. 2004). The plaintiffs fail to do so. As set forth above, the right of parents to direct the upbringing of their children does not extend to the dictation of school curriculum. Moreover, defendants' alleged conduct can, under no set of circumstances, be considered "conscience shocking" for the purposes of invoking plaintiffs' Fourteenth Amendment protection. With no colorable claim to combine with their free exercise claims, the plaintiffs fail to establish any "hybrid rights" to be tested under a strict scrutiny analysis. See Brown, 68 F.3d at 539 (hybrid exception held inapplicable absent privacy or substantive due process claim); Swanson v. Guthrie Ind. School Dist. No. 1-L, 135 F.3d 694, 697-698 (10th Cir. 1998) ("Plaintiffs have

shown no colorable claim of infringement on the constitutional right to direct a child's education. Accordingly, we hold that this is not a hybrid-rights case."); Hicks v. Halifax Cty. Bd. of Ed., 1999 WL 1940002, at *7 (E.D.N.C. 1999) (since parent's right to direct upbringing of son was not infringed by school uniform policy, case did "not implicate the 'hybrid' path of religious freedom left narrowly open by Smith.")

Tested instead under a rational basis test, defendants' use of the identified books must be held to pass constitutional muster. (See Section III(A)(1) above.) Count I of the plaintiffs' Complaint should, therefore, be dismissed.

### B. Defendants Did Not Unlawfully Interfere With Plaintiffs' Constitutional Rights Through "Threats, Intimidation or Coercion."

In Count II of their Complaint, plaintiffs allege that defendants' interference with their constitutional rights was accomplished through "threats, intimidation and coercion" and, therefore, plaintiffs are entitled to relief under M.G.L. c. 12, §§ 11H & 11I, the Massachusetts Civil Rights Act ("MCRA.")[31] The purpose of MCRA was to provide a state remedy for deprivations of civil rights that extends beyond federal remedies by doing away with the need for state action. Batchelder v. Allied Stores, 393 Mass. 819, 821 (1985). Thus, MCRA and the federal civil rights remedies are coextensive. Id. For the following reasons, however, the plaintiffs fail to state a claim for relief under MCRA. As a result, Count II must be dismissed.

First, as set forth above, plaintiffs' constitutional rights were not interfered with by the defendants. Defendants' use of diversity reading materials in the Elementary School curriculum was conducted pursuant to a neutral, generally applicable policy that did not unreasonably burden plaintiffs' free exercise of religion. Moreover, the curriculum policy was rationally-

[31] Complaint, ¶¶ 78 & 79.

related to defendants' legitimate interests in teaching Lexington students about diversity in a respectful environment free from discrimination based on race, gender, color, religion, sexual orientation or disability. Furthermore, plaintiffs' fundamental rights to direct the upbringing of their children were not compromised by defendants' selection of reading materials for Estabrook students, nor were plaintiffs' substantive due process rights to be free from "conscience shocking" behavior even remotely implicated by defendants' failure to provide opt-out procedures to the Parkers and Wirthlins before exposing their children to Who's In A Family, Molly's Family or King and King. In other words, for the same reason plaintiffs cannot recover under Count I, they cannot recover under Count II.

Second, even if plaintiffs were deprived of a constitutional right (which defendants deny), such deprivation was not accomplished through "threats, intimidation and coercion." Under Massachusetts law, a "threat" is the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass. 93, 104 (1987). "Intimidation" involves "putting [another] in fear for the purpose of compelling or deterring conduct." Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474 (1994). To be recoverable, a "threat" or "intimidation" must arise in the context of an actual or potential physical confrontation. Bally v. Northeastern Univ., 403 Mass. 713, 718-720 (1989); Tedeschi v. Reardon, 5 F. Supp. 2d 40, 46 (D. Mass. 1998). "Coercion" is "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." Planned Parenthood, 417 Mass. at 474; Deas v. Dempsey, 403 Mass. 468, 471 (1988). Thus, to be liable under MCRA for unlawful coercion, a defendant must force, or seek to force, the plaintiff "to do or not to do something . . ." against his

or her will. Pheasant Ridge Assoc. Ltd. v. Town of Burlington, 399 Mass. 771, 781 (1987).[32]

Defendants' inclusion of diversity materials in the Elementary School curriculum was unaccompanied by threats, intimidation or coercion of any nature whatsoever – whether physical or otherwise. The teaching of diversity and tolerance through the use of books depicting same-sex couples and a gay marriage was designed solely to accomplish the stated goals of the Commissioner of Education and Lexington Public Schools – i.e., "to inculcate respect for the cultural, ethnic and racial diversity of the Commonwealth . . . [without] . . . perpetuating gender, cultural or racial stereotypes." M.G.L. c. 69, § 1D.[33] Thus, defendants' curriculum was neither compelling nor coercive such that students were taught only one "correct" view with regard to families or relationships. On the contrary, the lesson was one of inclusion of various parent figures and community members.[34] Without evidence that plaintiffs were either forced to do or constrained from doing something against their will, their MCRA claims cannot prevail.[35]

Third, no MCRA claim may be brought against a municipality since a city or town is not a "person" subject to suit under MCRA. Howcroft v. City of Peabody, 51 Mass. App. Ct. 573, 591-592 (2001). Thus, the defendant, Town of Lexington, and the remaining defendants in their

---

[32] The Supreme Judicial Court recently expanded MCRA's scope by ruling that, "[i]n certain circumstances . . .," economic coercion may be actionable without an actual or potential physical confrontation. Buster v. George W. Moore, Inc., 438 Mass. 635, 648 (2003). This expansion, however, has no application here, where the plaintiffs make no allegation of harm to their economic interests.

[33] Complaint, ¶ 26.

[34] Id., ¶¶ 26, 40 & 43.

[35] Although Mr. Parker details, at great length, certain measures he took in an effort to convince school personnel that their position was in violation of his religious beliefs and rights, see id., ¶¶ 38 & 39; he does not seek recovery in this action for false arrest or unreasonable search and seizure. Nor does he assert any claim against the Lexington Police Department or any of its officers. Indeed, Mr. Parker admits that when school officials refused to agree to a "temporary plan," as proposed by him and his wife, he simply became "frustrated by the turn of events, refused to leave the school and was arrested for trespassing by the Lexington Police Department." Id., ¶ 38. Hence, Mr. Parker was not threatened or intimidated because of his religious beliefs; rather, he was arrested for his own refusal to leave school property. Even if Mr. Parker's arrest was wrongful, which the defendants deny, a direct violation of law does not, by itself, involve threats, intimidation or coercion and, thus, does not implicate MCRA. Longval v. Commissioner of Corrections, 404 Mass. 325, 333 (1989); Delaney v. Chief of Police of Wareham, 27

official capacities, are not proper defendants under Count II.

For the foregoing reasons, this Court should dismiss Count II – plaintiffs' MCRA claim – for failure to state a claim upon which relief can be granted.

### C. Massachusetts Opt-out Statute Does Not Create a Private Right of Action Enforceable by Plaintiffs.

In Count III of their Complaint, the plaintiffs seek recovery for the defendants' alleged violation of M.G.L. c. 71, § 32A, the so-called Opt-out Statute adopted by the Legislature as a parental notification law in 1996. The Opt-out Statute provides, in part, as follows:

> Every city, town, regional school district or vocational school district implementing or maintaining curriculum which primarily involves human sexual education or human sexuality issues shall adopt a policy ensuring parental/guardian notification. Such policy shall afford parents and guardians the flexibility to exempt their children from any portion of said curriculum through written notification to the school principal. No child so exempted shall be penalized by reason of such exemption.
> . . ..
> To the extent practicable, program instruction materials for said curricula shall be made reasonably accessible to parents, guardians, educators, school administrators, and others for inspection and review.

The Statute further requires the Department of Education to "promulgate regulations for adjudicatory proceedings to resolve *any and all* disputes arising under this section." Id. (emphasis added).[36] It makes no provision whatsoever for relief beyond such "adjudicatory proceedings" against a "city, town, regional school district or vocational school district" that either fails to adopt a notification policy, or fails to follow such a policy once it is adopted.

Plaintiffs admit that Lexington adopted a policy implementing Section 32A.[37] Yet plaintiffs do not allege that defendants breached this policy; instead, plaintiffs claim they had "a

---

Mass. App. Ct. 398, 409 (1989).

[36] Such regulations appear at 603 C.M.R. §§ 5.01, *et seq.*

[37] In Paragraph 43 of their Complaint, plaintiffs quote a statement issued by Superintendent Ash citing Lexington's Opt-out Policy. Although plaintiffs criticize said statement in the following Paragraph as "inaccurate" and "demean[ing]," they do not challenge the existence of the Opt-out Policy. Complaint, ¶ 44.

right [under M.G.L. c. 71, § 32A] to be notified and to excuse their children from [the Elementary School] curriculum."[38] It was defendants' alleged breach of "*this* right" – i.e., the statutory right to be notified and to excuse their children – that allegedly "caused the plaintiffs great damage" for which they now seek recovery under Count III.[39]

The defendants deny that the books Who's In A Family, Molly's Family or King and King involve "human sexual education" or "human sexuality issues." Even if such education or issues are indeed raised, these three works do not "*primarily* involve human sexual education or human sexuality issues" within the meaning of Section 32A. "Primarily" means "chiefly, mainly." Town of Eastham v. Clancy, 44 Mass. App. Ct. 901 (1997), citing American Heritage Dictionary (3d ed. 1992). The DOE defines "curriculum that primarily involves human sexual education or human sexuality issues" as:

> [C]ourses (typically, sex education or discrete units of a health education or biology course), school assemblies or other instructional activities and programs for which the instruction and materials focus principally on human sexual education, the biological processes of human reproduction and sexual development, or human sexuality issues.

603 C.M.R. § 5.02. King and King, even as described in plaintiffs' Complaint, no more "*primarily* involves human sexual education or human sexual activity" than Snow White and the Seven Dwarfs, Cinderella, Sleeping Beauty, Beauty and the Beast or The Princess and the Pea, all of which similarly involve romance. Simply because the characters who live happily ever after at the close of the story[40] happen to be members of the same gender does not mean the book either "chiefly" or "mainly" involves sex. King and King was included among the available reading materials to advance the goal of teaching diversity and tolerance as expressly encouraged

---

[38] Id., ¶ 83.
[39] Id., ¶ 84.
[40] Id., ¶ 53.

and endorsed by the Commissioner of Education and DOE. See M.G.L. c. 69, §§ 1D & 1E.[41]

Even if the defendants breached their statutory duty to notify the Parkers and Wirthlins (which the defendants deny), the plaintiffs cannot bring a private right of action to recover under M.G.L. c. 71, § 32A. To determine whether a state statute creates a private right of action, federal courts look to the interpretations of that statute by the state courts. See Morley-Murphy Co. v. Zenith Electronics Corp., 142 F.3d 373, 376 (7th Cir. 1998); Martin v. Northwestern Mut. Life. Ins. Co., 2006 WL 897751 *3 (E.D. Wis.) This Court, therefore, must look to Massachusetts decisions on the issue of implying private rights of action under Massachusetts statutes.[42]

According to the SJC, no private right of action can be inferred from a state statute absent clear legislative intent to support such a remedy. Loffredo v. Center for Addictive Behaviors, 426 Mass. 541, 546-547 (1998). In Loffredo, the SJC declined to create a private right of action from a state statute governing licensing and approval of drug treatment facilities where no language in the statute, nor any related parts of the statute, evinced a legislative intent to do so. Id., at 546. The Court's decision was also based on the Legislature's express contemplation of other remedies to address violations of the statute – to wit, the suspension, revocation or limiting of a license. Id., at 546-547. Loffredo is consistent with other Massachusetts decisions wherein the courts have consistently refused to imply a private right of action from a statute absent clear

---

[41] On July 26, 2004, the Commissioner issued a written decision to a parent of a student enrolled in the Bedford Public Schools on an appeal taken by the parent under the Opt-out Statute pursuant to 603 C.M.R. § 5.04(1). In his decision, the Commissioner ruled that a skit portraying a homosexual student and the difficulties he faced in school due to his sexual orientation was part of a curriculum that did *not* "primarily involve human sexual education or human sexual activity." Rather, it was part of a school-wide mandatory assembly designed to address issues of harassment and discrimination within the school and the community. Accordingly, Bedford did not violate the parent's or student's rights under the Opt-out Statute by failing to give the parent prior notification of the assembly. A copy of the Bedford decision is attached hereto as "C."

[42] The four-step analysis of Cort v. Ash, 422 U.S. 66 (1975), is employed only to determine whether a

legislative intent. See, e.g., Borucki v. Ryan, 407 Mass. 1009 (1990) (no private right of action implied in statute prohibiting disclosure of competency reports); Unitrode Corp. v. Dynamics Corp., 379 Mass. 487, 491-493 (1980) (no private right of action for equitable or injunctive relief implied from corporate take-over statute); Lindsey v. Massios, 372 Mass. 79, 84 (1977) (no private right of action implied from safety statute); Johnson v. United States Steel Corp., 348 Mass. 168, 169-170 (1964) (no private right of action implied from age discrimination statute).

Guided by the touchstone of legislative intent, it is clear that no private right of action may be implied from the language of the Opt-out Statute. In requiring the DOE to promulgate regulations to resolve "any and all disputes" regarding the Opt-out Statute, the Legislature made clear its desire that such disputes be resolved in accordance with DOE procedures. The stated purpose of the DOE regulations is to "encourage local resolution of disputes arising under M.G.L. c. 71, § 32A, and to provide for resolution by the Department of Education only when those disputes cannot be resolved by the parties at the local school or school district level." 603 C.M.R. § 5.01(3). Thus, the DOE regulations create a detailed system whereby a parent dissatisfied with a school principal's decision under M.G.L. c. 71, § 32A, may engage in a dispute resolution process with the school superintendent. 603 C.M.R. § 5.03(1). If a parent is dissatisfied with the superintendent's decision, the parent has a right to seek further review from the local school committee. 603 C.M.R. § 5.03(3). If a parent is dissatisfied with the school committee's decision, he or she may then submit a written request for review to the Commissioner, 603 C.M.R. § 5.04(1), who, in turn, will determine the process to be followed to resolve the dispute including, but not limited to, alternative dispute resolution and mediation. 603 C.M.R. § 504(2). If the matter cannot be resolved by the Commissioner, "[t]he

---

private right of action may be implied under federal law.

Commissioner shall designate a hearing officer who will conduct an adjudicatory hearing in accordance with 801 C.M.R. § 1.00, the Standard Adjudicatory Rules of Practice and Procedure." 603 C.M.R. § 504(3).

"Where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." Loffredo, 426 Mass. at 547, quoting Transamerica Mtge. Advisors, Inc. v. Lewis, 444 U.S. 11, 19 (1979). The DOE regulations make no mention of a private right of action. On the contrary, by detailing a process for the resolution of "any and all disputes," the Legislature expressed its clear intent that disputes regarding M.G.L. c. 71, § 32A, be resolved at the local and agency levels, not in the courts.[43]

For the foregoing reasons, this Court should dismiss Count III of the plaintiffs' Complaint for the failure to state a claim upon which relief can be granted.

### D. Defendants Did Not Unlawfully Conspire to Deprive Plaintiffs of Their Constitutional Rights.

In Count IV of their Complaint, plaintiffs allege that defendants conspired to deprive them of their constitutional rights, and that such conspiracy resulted in damages recoverable under 42 U.S.C. § 1983. A conspiracy is actionable under Section 1983 where "a combination of two or more persons [act] in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict the wrong against or injury upon another,' and 'an overt act that results in damages.'" Earle v.

---

[43] Although M.G.L. c. 71, § 32A, is silent regarding a private right of action, another provision of Chapter 71 – Section 34B – clearly allows for an action to be brought in Superior Court. M.G.L. c. 71, § 34B, states that, should a person operating or maintaining an educational institution refuse or neglect to furnish a written transcript to a requesting student or former student, "the student or former student . . . may present to the superior court . . . a petition addressed to said court and praying for such relief as it may deem proper in the circumstances . . .." Had the Legislature intended to grant jurisdiction to the Superior Court (or to any other court of the Commonwealth) over disputes arising under M.G.L. c. 71, § 32A, it could have included in Section 32A language similar to that included in M.G.L c. 71, § 34B. It did not do so.

Benoit, 850 F.2d 836, 844 (1st Cir. 1988), citing Hampton v. Hanrahan, 600 F.2d 600, 620-621 (7th Cir. 1979). In order to survive a motion to dismiss, however, it is not sufficient for a plaintiff merely to assert conclusory allegations of conspiracy; she must instead state with specificity the facts that, in plaintiff's mind, show the existence and scope of the alleged conspiracy. Slotnick v. Staviskey, 560 F.2d 31, 34 (1st Cir. 1977); Gallagher v. Commonwealth, 2002 WL 924243 (D. Mass. 2002) ("Conclusory allegations of conspiracy, without supporting material facts, will not suffice.")

Here, the plaintiffs do not set forth the facts of a conspiracy with sufficient specificity. They allege no agreement among the defendants to commit unlawful acts, nor do they identify the precise conduct allegedly engaged in by the defendants in pursuit of their unlawful conspiracy. Where a conspiracy allegation is "perfunctory," and "specifics as to the details of the alleged conspiracy or the predicate acts committed in pursuit thereof" are lacking, a conspiracy claim will not withstand a motion to dismiss. Miranda v. Ponce Federal Bank, 948 F.2d 41, 48 (1st Cir. 1991).

Further, as set forth above, the defendants' acts were not unconstitutional or unlawful. Thus, even if two or more defendants acted in concert so as to deny plaintiffs' opt-out "rights" vis-a-vis the Elementary School reading materials, such concerted action cannot give rise to a conspiracy claim under Section 1983. This Court, therefore, should dismiss Count IV of the plaintiffs' Complaint for the failure to state a claim upon which relief can be granted.

### E. The Individual Defendants are Entitled to Qualified Immunity as Against Plaintiffs' Civil Rights Claims.

Even if the individual defendants deprived plaintiffs of their constitutional rights by using the identified books as part of the Elementary School curriculum without giving the Parkers and

Wirthlins an opportunity to opt-out, the individual defendants remain protected from liability for damages under the defense of qualified immunity. Qualified immunity shields government officials performing discretionary functions from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1992); Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 91 (1st Cir. 1994) ("the relevant question is whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct.") Qualified immunity "gives ample room for mistake in judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Lowinger v. Broderick, 50 F.3d 61, 65 (1st Cir. 1995), quoting Hunter v. Bryant, 502 U.S. 224, 228 (1991) (*per curiam*). "A reasonable although mistaken conclusion about the lawfulness of one's conduct does not subject a government official to personal liability." Id. Moreover, qualified immunity protects the individual under both Section 1983 and MCRA. Rodriguez v. Furtado, 410 Mass. 878, 882 (1991); Duarte v. Healy, 405 Mass. 43, 46 (1989).

In designing a curriculum for Lexington Elementary School students, in selecting grade-appropriate reading materials to be used in teaching that curriculum, and in concluding that the materials so selected did not "primarily" involve human sexual education or human sexuality issues thereby invoking the notification provisions of the Massachusetts Opt-out Statute, Lexington school officials were operating in the realm of discretion. Thus, their decisions, even if unconstitutional (which the defendants deny) are protected from both suit and liability.

After first determining whether plaintiffs' allegations establish a constitutional violation,

this Court must next determine whether the constitutional right was clearly established at the time of the violation. Mihos v. Swift, 358 F.3d 91, 102 (1st Cir. 2004). If so, it must further decide "whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue." Id.

"The inquiry into the nature of a constitutional right for the purpose of ascertaining clear establishment seeks to discover whether the right was reasonably well settled at the time of the challenged conduct . . .." Martinez v. Colon, 54 F.3d 980, 988 (1st Cir. 1995). Further, such inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Suboh v. District Attorney's Office of Suffolk Dist., 298 F.3d 81, 93 (1st Cir. 2002). "If the operative legal principles are clearly established only at a level of generality so high that officials cannot fairly anticipate the legal consequences of specific actions, then the requisite notice is lacking." Savard v. Rhode Island, 338 F.3d 23, 28 (1st. Cir. 2003), cert. den., 540 U.S. 1109 (2004). Here, the right of a parent to dictate curriculum to a public school – either for religious reasons or because of a protected right to direct the upbringing of his or her child – was by no means "reasonably well settled" at the time Lexington officials chose to include the challenged books in the Elementary School classroom. On the contrary, the decisions of Brown and its progeny clearly indicate that plaintiffs' rights do not extend so far.

To determine the next step – the understanding of an objectively reasonable official – it is necessary to consider the alleged misconduct from the perspective of the individual defendants. Thus, even if Lexington officials erred – i.e., if they violated plaintiffs' clearly-established constitutional rights – the defendants are still immune if their mistake as to what the law required was reasonable. Saucier v. Katz, 533 U.S. 194, 205 (2001). Here, given the difficulty of

interpreting and protecting plaintiffs' so-called "hybrid rights" in an arena where public school officials are expressly encouraged by the Commonwealth to teach diversity and tolerance at the earliest grade levels, where the SJC recently upheld same-sex marriages as constitutional, see Goodridge v. Department of Public Health, 440 Mass. 309 (2003), and where application of the relatively new Opt-out Statute is limited solely to curricula "primarily" involving human sexual education or human sexuality issues, it cannot be said that no reasonable official in the position of the defendants could have believed that his or her actions were lawful. As a result, the individual defendants are entitled to qualified immunity. Counts I, II and IV of plaintiffs' Complaint as against them must be dismissed.

## IV. CONCLUSION

For the reasons stated above, the plaintiffs fail to state a claim against the defendants upon which relief can be granted. Therefore, this Court should dismiss plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

The defendants,
WILLIAM HURLEY, et al.,

By their attorneys,
**PIERCE, DAVIS & PERRITANO, LLP**

John J. Davis, BBO #115890
Ten Winthrop Square
Boston, MA 02110
(617) 350-0950

CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing Pleading on all parties by ~~mailing same, postage Prepaid;~~ electronic Mail to all counsel of record.
Signed under the pains and penalties of perjury.
DATED: 8/15/06

# EXHIBIT "A"



[redacted]

# EXHIBIT "B"

# Massachusetts Comprehensive Health Curriculum Framework

October 1999

**Massachusetts Comprehensive Health Curriculum Framework Committee Members**

Margaret T. Burton, R.N., M.S., Health and Nursing Coordinator, Lawrence Public Schools
Patricia Degon, M.Ed., Health and Physical Education Director, Shrewsbury Public Schools
Michael P. Gill, Ph.D., Director of Health Education, Cohasset Public Schools
Warren Y. Hershman, M.P.H., M.D., Internist, Boston Medical Center,
Boston University School of Medicine
Janet B. Schwartz, M.S., R.D., Professor, Food and Nutrition, Framingham State College
Benjamin S. Siegel, M.D., Pediatrician, Boston Medical Center,
Boston University School of Medicine
Christine B. Sweklo, M.S., Director of Secondary Education, Health Education Coordinator,
Frontier Regional/School Union #38

**Massachusetts Department of Education Staff**

John Bynoe, Administrator, Learning Support Services
Nancy Coville, Supervisor, Learning Support Services
Anne Gilligan, Liaison, Learning Support Services
Sandra Stotsky, Deputy Commissioner, Academic Affairs and Planning
Donna Taylor, Liaison, Learning Support Services
Carole Thomson, Associate Commissioner, Educational Improvement

**Writer**

Dale McManis, Ph.D.

# MASSACHUSETTS COMPREHENSIVE HEALTH CURRICULUM FRAMEWORK
# TABLE OF CONTENTS


I Visual Overview of the Health Framework ii

II Introduction 1

III Core Concept 3

IV Guiding Principles 4

V Considerations in Health Education 9

VI Strands and Learning Standards

Physical Health Strand 10
- Growth and Development 12
- Physical Activity and Fitness 14
- Nutrition 18
- Reproduction/Sexuality 21

Social and Emotional Health Strand 24
- Mental Health 26
- Family Life 29
- Interpersonal Relationships 32

Safety and Prevention Strand 35
- Disease Prevention and Control 37
- Safety and Injury Prevention 40
- Tobacco, Alcohol, and Other Substance Use/Abuse Prevention 43
- Violence Prevention 46

Personal and Community Health Information Strand 49
- Consumer Health and Resource Management 51
- Ecological Health 54
- Community and Public Health 56

VII References and Sources 59

Appendices

A Massachusetts Guiding Principles and National Standards 62
B Law & Policy Around Health and Health Education 67
C Technology Literacy and Health Education 75

D Resources for Health Education 78

# INTRODUCTION

The purpose of the Massachusetts Comprehensive Health Curriculum Framework is to provide guidance for Massachusetts school districts in the acquisition of the knowledge, skills, and habits needed by students. Comprehensive health education includes health education, physical education, and family and consumer sciences education. Teachers within these subjects need to work collaboratively with counselors, school nurses, nutrition services staff, other teachers, families, and students from pre-kindergarten through grade 12.

The Framework synthesizes current research and sets learning standards for students from pre-kindergarten through grade twelve. The Framework presents a broad outline upon which Massachusetts school health curricula, instruction, and locally designed and administered assessments can be based.

**Organization of the Health Curriculum Framework**

- The **Core Concept** presents the fundamental purpose of a comprehensive health curriculum.
- The **Guiding Principles** direct and inform health education and the building of school communities that promote the health and well being of students, families, teachers, and staff.
- The **Strands** organize the areas included in comprehensive health education as outlined in the Massachusetts General Laws, particularly Chapter 71. (*see Appendix B*)
- The **PreK-12 Standards** define topic oriented content and set expectations for knowledge and skills that students should acquire from their study in health.
- The **Learning Standards** reflect measurable student competencies and are grade span specific (PreK-5, 6-8, 9-12). Selected examples are provided in the Framework.

This Health Framework is built upon the work of the panel who developed the first Health Framework. The current Health Framework was developed by a committee of Massachusetts teachers of health, physical education, family and consumer sciences, health educators from higher education, physicians, and school nurses. The Health Framework is intended to be used in conjunction with the other Massachusetts Curriculum Frameworks to make connections among all subjects.

There are specific areas of particular relevance to health education. Two of these that are notable are the links between health and school performance, and health education and family involvement.

Education in all subjects can be more effective when health is a priority throughout the school. Health and learning are closely related. Students who are unhealthy or troubled are students whose learning may not be optimal. Because good health is linked with better school performance, schools have a vested interest in preventing risk behaviors that have a negative impact on health.[1] For example, students who use tobacco products can experience difficulty concentrating. Alcohol and drug use impairs the brain's ability to process information, form memories, and recall information. Teen pregnancy is related to dropping out of school. Poor nutrition decreases cognitive functioning in the areas of language, concentration, alertness, and attention.

---

[1] The following research is cited in the References and Sources of the Framework.

Some students who have participated in school health education programs, compared to similar students who have not participated in such programs, have increased cognitive development and awareness, better school attendance, higher graduation rates, increased goal-setting, and better application of decision-making skills. Certain components of the school health program have also been found to be related even more directly to school performance. For example, after controlling for other explanatory factors, participation in school breakfast programs was associated with increased scores in mathematics, language, and reading, and with decreases in school absence and tardiness. Similar results have been found with students who participated in more comprehensive school health programs. For example, students at risk for school failure who participated in school-linked health and human services had improved grades and earned more credits compared to similar peers who did not receive such services.

Even as adults, education is related to less involvement in certain risk behaviors and higher participation in healthy behaviors. The results of a recent survey conducted by the Massachusetts Department of Public Health among Massachusetts adults found a relationship between more years of education and several health related behaviors, such as lower rates of smoking, eating the recommended daily allowance of fruits and vegetables, and participation in recommended levels of physical activity.

Today, Massachusetts students face many potential health problems related to their social environment, but the risk behaviors associated with these problems are largely preventable. Comprehensive health education addresses the knowledge and skills for both reducing risk behaviors and increasing actions and habits that increase wellness.

A major component of comprehensive school health education is parental and family involvement. Parents and families are their children's first and continuing teachers and they influence the health decisions that are made by their children. Family and community involvement is important in the planning of appropriate health education and in strengthening health lessons and skills development. Schools have historically worked side by side with families and communities to promote acceptable standards of conduct and the attributes that foster them, such as civility and being responsible for one's actions. Health education supports this through an emphasis on skills of decision-making, problem-solving, and critical thinking for responsible conduct.

Comprehensive health education occurs in relation to many contextual factors. Health sometimes involves sensitive topics that may have social, economic, genetic, or religious implications. Of note, Massachusetts public schools must notify parents before implementing curriculum that involves human sexuality. The approach of the Massachusetts Comprehensive Health Curriculum Framework is to encourage each district to work with family and community members in the development and implementation of the health education curriculum in the schools of that district.

# CORE CONCEPT

Through health literacy, self-management skills, and health promotion, comprehensive health education teaches fundamental health concepts, promotes habits and conduct that enhance health and wellness, and guides efforts to build healthy families, relationships, schools, and communities.

**Health Literacy** focuses on acquisition of knowledge and includes:

- the capacity to obtain, understand, and evaluate health information and services;
- learning about physical changes and how the body functions; and
- knowledge of the relationship between movement and health.

Through reading, observation, discussion, and actions students learn to locate information and assess its reliability, make reasoned decisions based on accurate information, and apply their knowledge to their own health and safety. Students learn what it is to be healthy, about development, and about the importance of physical fitness in their overall level of health and wellness. Health literacy is critical for healthy self-management and health promotion.

**Healthy Self-Management** enables students to:

- integrate and apply knowledge and skills with respect to their health-related decisions, actions, and conduct;
- learn to assume increased responsibility for their health-related decisions, actions, and conduct; and
- consider potential consequences and evaluate outcomes.

Healthy self-management entails self-assessment, goal setting, and decision-making based on an understanding of risk and probability. By practicing a repertoire of developmentally appropriate behaviors that promote health, students can significantly increase the likelihood of good physical, emotional, cognitive, social, and environmental health.

**Health Promotion** helps students demonstrate:

- competence in using information and services;
- how to present accurate information about health; and
- the capability to respond to health concerns, including emergencies.

Knowledge and good communication skills are critical to health promotion. Students learn how to present factual information about health in ways that promote responsible actions while still considering the rights of individuals. Health promotion can take many forms. By contributing to improvements in the health of the natural environment and the physical safety of their communities, students learn what can be accomplished by an individual as well as by a group. Students work with families, school staff, and community members to determine concrete steps they can take to build a strong social fabric that fosters positive growth and development.

Fundamental health knowledge and skills need to be taught starting in pre-kindergarten and early elementary years, and reinforced and expanded regularly in subsequent grades. A planned, sequential curriculum addresses a variety of topics with increasing degrees of complexity appropriate to students' developmental levels as they move from early to middle childhood and then into adolescence. Such a program ensures thorough, balanced coverage of health content areas, and its success relies on skilled teachers who readily adapt to incorporate emerging health topics.

# GUIDING PRINCIPLES OF COMPREHENSIVE HEALTH EDUCATION IN MASSACHUSETTS

## GUIDING PRINCIPLE I

Comprehensive Health Education Teaches Students Fundamental Health Concepts And Skills That Foster Healthy Habits And Behaviors For The Individual And Others Through **Sequential And Coordinated Teaching** Of Health Education, Physical Education, And Family And Consumer Sciences Education At Each Grade Level, Prekindergarten Through Grade 12.

Comprehensive health education provides a foundation in public health, medical knowledge, and modes of inquiry into how individuals and societies acquire their health-related knowledge, and empowers students to change unhealthy attitudes and behaviors. Students learn factual information and develop skills for finding and evaluating information and resources, for making decisions, and for setting goals to promote their own health and the health of others. These others may include family, friends, coworkers, neighbors, etc. Physical education focuses on body dynamics, movement, physical fitness, competition, and teamwork. Family and Consumer Sciences education examines the concepts of personal living, family life, parenting, work, nutrition, and consumerism.

Health education, physical education, and family and consumer sciences education each contribute to comprehensive health education. Together they increase students' knowledge of health concepts, life management skills, and habits that can facilitate lifelong health for the individual and for others. To be most effective, health should be taught regularly, beginning with a student's entry into school and continuing through grade 12. A sequential curriculum introduces concepts and skills in the early grades and reinforces them with more detailed and complex information and skills in the later grades.

## GUIDING PRINCIPLE II

Comprehensive Health Education Teaches Students To Use Fundamental Health Concepts To **Assess Risks**, To Consider Potential Consequences, And To Make Health Enhancing Decisions.

Comprehensive health education equips students to assess risks in an informed manner in their everyday lives. Students learn how to identify and evaluate various types and degrees of health risk and become aware of specific behaviors that pose risks for themselves and others, now and in the future. Students learn how to determine the likely consequences of their actions

and how to determine which information is needed to assess health risks and to make responsible decisions. Influences on personal health, including why people relapse into unhealthy conduct and behaviors and how relapse can sometimes be prevented, are important health concepts.

Comprehensive health education teaches students to inquire and solve problems competently. Students set goals, appraise risks, and demonstrate behaviors and conduct that protect and enhance their health. In this way, and in partnership with families and communities, health education supports the resilience of students.

**GUIDING PRINCIPLE III**

Comprehensive Health Education Teaches Skills That Assist Students To Understand and **Communicate** Health Information Clearly For Self-Management And Health Promotion.

Comprehensive health education teaches students to identify health information and resources that are current and applicable to their lives. Students learn the types of questions to ask and information to provide when talking with health professionals.

In our society, health information is communicated through a variety of means, such as through health care providers, the media, including professional publications, and health-related events. Through health education, students acquire media literacy by learning to determine if health information is accurate, with whom to share health information, and how to avoid communicating inaccurate information. Health education provides criteria for interpreting conflicting health research and in finding resources for independent research into health topics.

**GUIDING PRINCIPLE IV**

Comprehensive Health Education Contributes To The Capacity Of Students To Work In A Positive Manner With Families, School Staff, Peers, And Community Members To Enhance Personal Health And Create **A Safe And Supportive Environment** Where Individual Similarities And Differences Are Acknowledged.

Comprehensive health education provides opportunities for students to join with their families, peers, school staff, and community members to build safe schools and communities. As with the other Frameworks, health contributes to learning about similarities and differences among students.

Health education helps students recognize that personal health is part of the dynamic interaction between individuals and their social environments. Students study ways in which peers, families, mentors, groups, and institutions foster healthy attitudes and expectations of success. Students examine protective factors that support healthy behaviors and habits. Students learn how health promotion is related to caring appropriately for their own health needs and

showing others how to maintain and improve their health. Comprehensive health education supports the connections between physical, emotional, cognitive, and social health.

Health education helps students recognize conditions that would make their school safe and accepting of the dignity and worth of all individuals regardless of race, gender, disability, sexual orientation, religion, or social or economic background. Students learn about the kinds of activities that build trust and community, the importance of a broad coalition in these activities, and how to make known the presence of support services in their school and community.

## GUIDING PRINCIPLE V

**Comprehensive Health Education Is Strengthened Through Collaboration And Partnerships Among All Components Of The Coordinated School Health Program And Other Subjects.**

The components of a coordinated school health program include classroom-based education as well as program components that are support or service oriented. *(see Figure 1)*

**Classroom-Based Education**

- Comprehensive Health Education (PreK-12)
  - Health Education
  - Physical Education
  - Family and Consumer Sciences Education

**Support and Service Components**

- Food and Nutrition Services
- Health Services
- Counseling, Psychological, and Social Services
- Parent, Family, and Community Involvement
- Health Promotion for Staff
- Safe and Healthful School Environment

Health education, physical education, and family and consumer sciences teachers collaborate with other school health program staff to connect students with services and activities and provide a healthy school environment for students. When these components are linked in a planned, coherent, mutually supportive system, they reinforce health knowledge and skills as well as attitudes and behaviors that help students stay healthy.

For example:

- Health services, food and nutrition services, and psychological and counseling services provide direct services to students.
- Health education involves families in the life of the school, helping them to support students' academic achievement and health.
- Health promotion programs for staff enable teachers and other staff members to recognize the importance of lifelong health, and to model healthy behaviors for students.

A safe and healthy school environment is a necessity for successful teaching and learning. When instruction and services work together, they can build alliances with the community that improve physical, educational, and social outcomes for all students. The district

# REPRODUCTION/SEXUALITY

Reproduction/Sexuality involves physical development, emotions, and social elements. Instruction incorporates aspects of biology, psychology, sociology, literature, the arts, and philosophy.

The study of Reproduction/Sexuality provides young people with the knowledge and skills necessary to make informed choices. It addresses decisions about abstaining from and postponing sexual intercourse. Knowledge about how to avoid sexually transmitted infections that endanger one's health and well being as well as that of a partner is an important component of instruction. Communication skills can support such decisions. Addressing Reproduction/Sexuality in an appropriate and factual fashion leads to informed young people, increasing the likelihood of students making healthy decisions. It is particularly important in Reproduction/Sexuality to consider developmental appropriateness. Topics generally covered in Reproduction/Sexuality include: Development and Wellness.

Note: **Please see parental notification law in Appendix B, p. 69.**

## PreK-12 Standard 4: Reproduction/Sexuality

Students will acquire the knowledge and skills necessary to make effective personal decisions that promote their emotional, sexual, and reproductive health.

## Learning Standards: Reproduction/Sexuality

| | |
|---|---|
| PreK-5 | ***Development***<br>4.1 Identify the components, functions, and processes of the reproductive system.<br>4.2 Identify the physical changes as related to the reproductive system during puberty.<br>4.3 Define sexual orientation using the correct terminology (such as heterosexual, and gay and lesbian).<br>***Wellness***<br>4.4 Recognize that diet, exercise, rest, and avoidance of risk behaviors such as smoking, drinking, and other substance use contribute to the health of a mother and fetus. |
| 6-8 | ***Development***<br>4.5 Recognize the emotional and physical changes as related to the reproductive system during puberty.<br>***Wellness***<br>4.6 Explain the benefits of abstinence, postponing sexual behavior, and setting limits on sexual behavior.<br>4.7 Describe short- and long-term consequences of sexuality-related risk behaviors and identify barriers and supports for making health-enhancing decisions.<br>4.8 Describe behaviors and methods for pregnancy prevention, including abstinence.<br>4.9 Define the types of sexually transmitted infections (STIs), including HIV/AIDS, and how they are prevented.<br>4.10 Identify sexual discrimination and harassment. |
| 9-12 | ***Development***<br>4.11 Identify the stages of the male and female reproductive systems over the life cycle.<br>4.12 List the signs of pregnancy.<br>4.13 Describe the effectiveness and consequences of various pregnancy, HIV, and STI prevention methods, including abstinence.<br>4.14 Identify possible determinants of sexual orientation and analyze the weight of each in light of available research.<br>***Wellness***<br>4.15 Explain the importance of examination of both genders for HIV and STIs before conception and the risks and precautions of delivery when HIV and STIs are present.<br>4.16 Describe proper prenatal care and identify types of birth defects.<br>4.17 Explain the importance of communication and setting limits in a sexual relationship.<br>4.18 Identify and distinguish among types and degrees of sexual risk (pregnancy, sexual assault, STIs, including HIV/AIDS)<br>4.19 Evaluate the impact of HIV/AIDS on the community, medical resources, and family.<br>4.20 Identify resources available for treatment of reproductive health problems. |

**Selected Examples: Reproduction/Sexuality**

4.1 Students label the functions and/or systems of the reproductive system on a blank diagram.

4.2 Invite the school nurse or a health care professional who specializes in children to discuss the changes that take place in boys and girls at puberty.

4.4 Students write short answers to define the types of sexual orientation.

4.7 Students discuss consequences around sexuality decisions. Determine and role-play steps that improve decision-making (such as with whom to consult, information overlooked).

4.9 Students report on the policies of various states and countries regarding STIs prevention among youth.

4.10 Students use current events or media portrayal to discuss the consequences of discrimination based on sexual orientation.

4.13 Students identify ways to prevent pregnancy and sexually transmitted infections.

**Interdisciplinary Objectives: Reproduction/Sexuality**

| | |
|---|---|
| 9-12 | 4.a. (*Law and Policy. Connects with History & Social Science: Civics & Government*) Identify and explain laws about reproductive services. |
| 9-12 | 4.b. (*Law and Policy. Connects with History & Social Science: Civics & Government*) Explain the laws and relevant court rulings concerning rights about consensual sexual relationships and reproduction (e.g., Roe v. Wade, Bowers v. Hardwick). |

# FAMILY LIFE

Family Life focuses on the importance of the family as a basic unit of society and the many responsibilities within a family. Family Life highlights the diverse perspectives, needs, and characteristics of families and the internal and external supports that families rely on throughout the family life cycle. Family Life addresses parenting in a world where technology and research provide new information and options on a regular basis.

A critical focus of Family Life is helping students understand that while families differ, there are many similarities within all families. Through the study of Family Life, students can gain an understanding that a family, regardless of its composition, fulfills certain critical needs. Resilience can be fostered by the recognition that many factors may affect the stability and health of a family, but that many supports are available to help families. Family Life focuses on parenting as a choice and as a major responsibility. Both emotional maturity and parenting skills are necessary for child rearing. The development of good character in children is one important responsibility for parents and families. Understanding the stages of child development will make parenting more successful for both the child and the parent. Topics generally covered in the study of Family Life include: Functions and Purposes, Supports, and Parenting.

## PreK-12 Standard 6: Family Life

Students will gain knowledge about the significance of the family on individuals and society, and will learn skills to support the family, balance work and family life, be an effective parent, and nurture the development of children.

## Learning Standards: Family Life

| | |
|---|---|
| PreK-5 | ***Functions and Purpose***<br>6.1 Describe different types of families, addressing membership and social influences, and the functions of family members.<br>6.2 Describe factors, such as character traits of individuals and life events, that can strengthen families.<br>***Supports***<br>6.3 Identify whom to talk with about family problems and successes.<br>***Parenting***<br>6.4 Identify what parents do to provide a safe, healthy environment for their children. |
| 6-8 | ***Functions and Purpose***<br>6.5 Describe how the functions, purposes, and responsibilities of family members change with life events.<br>6.6 Explain the family life cycle and recognize that raising a child is one of the most important functions of a family.<br>***Supports***<br>6.7 Describe those one can trust or turn to for help when needed, such as a support system that can include relatives, friends, neighbors, community organizations, and faith-based groups.<br>***Parenting***<br>6.8 Describe ways in which relationships among parents and children change during adolescence, and compare peer and parental influences. |
| 9-12 | ***Functions and Purpose***<br>6.9 Explain the functions, purposes, and social significance of family from various historical periods, including modern times.<br>6.10 Identify the traits of a healthy family (such as responsibility, communication, trust, loyalty, respect, commitment, love, affirmation, and self-reliance) and explain the interdependence and independence of family members.<br>***Supports***<br>6.11 Identify steps for getting support or help, including identifying resources for families whose members have special health needs.<br>***Parenting***<br>6.12 Identify the child-rearing skills (including emotional maturity to nurture children and knowledge of child development stages) and the financial resources needed for parenting.<br>6.13 Evaluate various types of discipline parents might use with children of different ages.<br>6.14 Describe the consequences of teen parenting from the perspectives of the teen mother, teen father, and the parents of the teens.<br>6.15 Identify desirable character traits (such as love, respectfulness, generosity, kindness, and forgiveness) and describe the development of good character, including the role of parents and family in the moral development of children.<br>6.16 Describe considerations relevant to becoming a parent (including the various ways of becoming a parent such as foster parenting, adoption, and stepparenting).<br>6.17 Describe parental practices that encourage literacy in young children. |

## Selected Examples: Family Life

| | |
|---|---|
| 6.2 | As a class, design a bulletin board collage on the many different things adults know and are able to do. Discuss why a person with these skills, experiences, talents, and information would be a good person to talk to when you have a problem or have experienced a success. |
| 6.5 | Students list events (such as new baby, remarriage, or grandparent moving in) that can lead to changes in family composition and analyze their possible influence on family life. |
| 6.9 | Students view films that show changes in families in the last 50 years and identify what constants appear (e.g., caring for each other) and what changes appear evident (e.g., role changes in household and parenting tasks). |
| 6.12 | In supervised small groups, students respond to the developmental and health needs of young children in a child care setting and evaluate skills with the supervisor. |
| 6.17 | Design a pamphlet summarizing research and activities for parents to promote literacy in their young children. Have an early childhood specialist evaluate the pamphlet and provide feedback to students. |

## Interdisciplinary Objective: Family Life

| | |
|---|---|
| 9-12 | *(Law and Policy. Connects with History & Social Science: Civics and Government)*<br>6.a. Identify laws related to child abuse. |

# INTERPERSONAL RELATIONSHIPS

Interpersonal Relationships focuses on the importance of sound and stable relationships with other people with whom individuals share their lives, such as family, friends, co-workers, and community members. Communication skills are an essential component to help build safe and long-lasting relationships throughout the life cycle. Equally important are character attributes such as respect and responsibility, which are essential for healthy personal development, caring interpersonal relationships, and a humane and democratic society.

Instruction in Interpersonal Relationships facilitates students' understanding that very few events in life occur in isolation from other people, so the ability to achieve healthy relationships is critical for well being. This is especially true for major life events such as starting school, going away to college, entering the workforce, marriage, or child rearing. Students learn about the different kinds of relationships that people can have, such as neighborly relationships, family relationships, peer and friend relationships, and romantic relationships. Instruction in Interpersonal Relationships highlights the recognition that each person has internal personal choices and decisions to make regarding relationships, as well as providing the knowledge about the many external factors that can affect those relationships. Skills and strategies to relate to others as well as the recognition of the contribution of personality and good character to relationships can be learned through health education programs that address Interpersonal Relationships. Topics generally covered in Interpersonal Relationships include: Communication, Peer Relationships, and Romantic Relationships.

Note: **Please see parental notification law in Appendix B, p. 69.**

## PreK-12 Standard 7: Interpersonal Relationships

Students will learn that relationships with others are an integral part of the human life experience and the factors that contribute to healthy interpersonal relationships, and will acquire skills to enhance and make many of these relationships more fulfilling through commitment and communication.

## Learning Standards: Interpersonal Relationships

| | |
|---|---|
| PreK-5 | ***Communication***<br>7.1 Explain why communication is essential in human relationships and identify people from whom children can learn how to communicate, such as family members, friends, community members, and members of faith-based groups.<br>7.2 Apply both verbal and non-verbal communication skills to develop positive relationships and improve the social environment of the school.<br>***Peer Relationships***<br>7.3 Describe the concept of friendship and contrast qualities that strengthen or weaken a friendship, including the importance of sound character in interacting with others.<br>7.4 Describe the concepts of prejudice and discrimination. |
| 6-8 | ***Communication***<br>7.5 Apply attentive listening, feedback, and assertiveness skills to enhance positive interpersonal communication.<br>***Peer Relationships***<br>7.6 Explain how peer pressure influences choices and apply strategies for managing negative peer pressure and encouraging positive peer pressure.<br>7.7 Recognize the positive contribution of character traits (such as tolerance, honesty, self-discipline, respectfulness, and kindness) to relationships, the benefit to relationships which include understanding and respecting individual differences, and the detrimental effect of prejudice (such as prejudice on the basis of race, gender, sexual orientation, class, or religion) on individual relationships and society as a whole.<br>***Romantic Relationships***<br>7.8 Describe the purpose of dating and acceptable dating attitudes (such as respect) and appropriate conduct.<br>7.9 Explain the benefits of abstinence, postponing sexual behavior, and setting limits on sexual behavior. |
| 9-12 | ***Communication***<br>7.10 Identify techniques for handling anger and resolving conflicts in the family, friendships, and the workplace, including seeking help from professional and community organizations and faith-based groups.<br>7.11 Contrast the emotional impact on long-term relationships of positive communication (such as active listening, praise, and humor) with negative communication (such as teasing, name calling, bullying).<br>7.12 Describe the influence of the larger social group on individual conduct (such as giving comfort, solving problems, and controlling deviant behavior through enforcing laws and the development of good character in the members of society).<br>7.13 Explain the importance of communication in setting limits in a sexual relationship.<br>***Peer Relationships***<br>7.14 Explain the purpose of friendship in different stages of the life cycle and describe how friends can support one another in making healthy decisions.<br>7.15 Recognize and identify the concept of friendship without romantic involvement and how friendship may develop into romantic relationships.<br>***Romantic Relationships***<br>7.16 Explain the importance of responsibility and character traits such as love, respectfulness, generosity, kindness, and forgiveness, in committed relationships.<br>7.17 Describe commitment in casual and serious relationships. |

## Selected Examples: Interpersonal Relationships

7.2 Students design posters, bulletin boards or web page components on the theme of the 3R's—Responsibilities, Rights, and Respect. Include examples of conduct and policies that reflect the 3R's in the school.

7.6 Students identify risk-taking behaviors that a teen might consider. Working in small groups, practice and evaluate refusal skills for those risk behaviors that are dangerous.

7.7 Students read literature on prejudice and write a paper on how it can cause conflict in communities.

7.8 Students identify social interaction patterns among young people and compare the functions those patterns serve in developing relationships with others. Invite the school counselor to discuss appropriate and inappropriate conduct in pre-adolescent friendships and dating.

7.17 Students create skits that deal with various decisions made at the developmental stages of relationships. Videotape and analyze the skits with regard to the different decisions people might be faced with in these relationships.

To Next Section →

# APPENDIX A: MASSACHUSETTS GUIDING PRINCIPLES OF COMPREHENSIVE HEALTH EDUCATION LINKED WITH NATIONAL STANDARDS IN HEALTH EDUCATION, PHYSICAL EDUCATION, AND FAMILY AND CONSUMER SCIENCES EDUCATION

Much of the work being done on the local and national level in health education, physical education, and family and consumer sciences education uses national standards to some extent. The following pages show "matches" between the Massachusetts Health Curriculum Framework Guiding Principles (GP) and the National Standards in Health Education, Physical Education, and Family and Consumer Sciences Education. These can help inform schools, other states, and national programs about the work Massachusetts is doing in these areas.

## MASSACHUSETTS GUIDING PRINCIPLES OF COMPREHENSIVE HEALTH EDUCATION

***GUIDING PRINCIPLE I***
***Comprehensive health education teaches students fundamental health concepts and skills that foster habits and behaviors for oneself and others through the coordinated teaching of health, physical education and family and consumer sciences education at each grade level, prekindergarten through grade 12.***

***GUIDING PRINCIPLE II***
***Comprehensive health education teaches students to use fundamental health concepts to assess risks, to consider potential consequences, and to make health enhancing decisions.***

***GUIDING PRINCIPLE III***
***Comprehensive health education teaches skills that assist students to understand and communicate health information clearly for self-management and health promotion.***

***GUIDING PRINCIPLE IV***
***Comprehensive health education contributes to the capacity of students to work in a positive manner with families, school staff, peers and community members to enhance personal health and create a safe and supportive environment where individual similarities and differences are acknowledged.***

***GUIDING PRINCIPLE V***
***Comprehensive health education is strengthened through collaboration and partnerships among all components of the coordinated school health program and other subjects.***

# EXHIBIT "C"

Bedford Decision

# The Commonwealth of Massachusetts
## Department of Education

350 Main Street, Malden, Massachusetts 02148-5023

Telephone: (781) 338-3000

July 26, 2004

[redacted]
Bedford, MA 01730

Re: Review of Final Local Decision under Parental Notification Law

Dear Mr. and Mrs. [redacted]:

This is in response to your June 29, 2004 request for review pursuant to 603 CMR 5.04(1) of a final local decision of the Bedford School Committee under G.L. c. 71, § 32A, the Parental Notification Law. In your request for review, you allege that the Bedford Public Schools and the Bedford School Committee ("Bedford") violated G.L. c. 71, § 32A in regard to your two daughters, both of whom attended the John Glenn Middle School ("the school") during the 2003-2004 school year. Pursuant to G.L. c. 71, § 32A and Bedford's own local policy, in March of 2004, you exempted your daughters from participating in any portion of the school curriculum that primarily involved human sexual education or human sexuality issues. You now claim that Bedford failed to notify you of such curricula, and failed to comply with its local process for dispute resolution.

Specifically, you allege that Bedford violated G.L. c. 71A, § 32A by failing to: 1) notify you of a school assembly that included a skit about a homosexual student; 2) notify you of the display of a rainbow flag signifying gay pride in the main corridor of the school; 3) exempt your children from exposure to the flag display after you specifically requested such exemption; and 4) adhere to its local process for dispute resolution by allowing the Superintendent to collude with and influence improperly Bedford School Committee members during the local review process.

After review of the materials submitted by you, and for the following reasons, I have determined that Bedford has complied with G.L. c. 71, § 32A and 603 C.M.R. 5.00, the regulations promulgated under G.L. c. 71, § 32A.

The facts, as provided in the documentation you submitted to the Department, are as follows:

On September 23, 2003, in accordance with G.L. c. 71, § 32A and Bedford's own parental notification policy, the school sent a letter to students' parents informing them of the seventh and eighth grade curricula involving sexual education or human sexuality issues, and of the parents' right to exempt their children from such curricula. The letter provided no information regarding a forthcoming flag display or school-wide assembly entitled "Respect for Differences Day."

On November 24, 2003, the school coordinated a "Respect for Differences Day." The day was designed "to foster a deeper understanding of differences in our country and our world." The specific purpose of the day was "to confront the issue of bullying, and to send a strong, consistent message that bullying is wrong and will not be tolerated for any reason, under any circumstances." The day included a school-wide mandatory assembly at which Michael Fowlin, Ph.D. presented a series of short skits. The skits were designed to address the issue of harassment and discrimination by students on the bases of race, disability, ethnicity, and sexual orientation. Of the eight skits that Dr. Fowlin presented, each of which portrayed a hypothetical student whose personal characteristics caused the student to suffer harassment or bullying in school, one concerned a homosexual student and the difficulties the student faced in school because of his sexual orientation.

As part of the same project, school officials installed in the school's main corridor a display of flags representing different nationalities. The display included a rainbow flag donated by a teacher at the school. The caption of the rainbow flag originally read "Gay Pride," but, at the request of some parents, the school subsequently changed the caption to read "Freedom." The flag display, including the rainbow flag, remained installed in the school's main corridor for several months after the November 24th "Day of Respect." The school did not provide prior notice to parents regarding the gay pride flag and/or the skit regarding a homosexual student.

On March 22, 2004, you wrote to Thomas Campbell, principal of the school ("the principal"), requesting that your daughters "be exempted from school assemblies or other instructional activities and programs that focus on human sexual education or human sexuality issues, such as being exposed to flags of sexual orientation." You received no response from Mr. Campbell to your letter, and the flag display, including the rainbow flag, remained installed in the school.

On April 7, 2004, you wrote to Dr. Maureen Lacroix, Superintendent of Bedford Public Schools ("Superintendent") requesting a review, under 603 C.M.R. 5.03(1), of the principal's inaction regarding your daughters' continued exposure to the rainbow flag. The Superintendent responded on April 27, 2004, asserting that the school could hang the rainbow flag without parental notification under G.L. c. 71, § 32A. In her letter, the Superintendent explained that the primary purpose of the "Day of Respect" was not to provide instruction on issues of human sexuality but, rather, to promote tolerance and respect among students. Thus, the Superintendent concluded, neither the rainbow flag nor the November 24th assembly constituted a curriculum that "primarily involved human sexual education or human sexuality issues" under G.L. c. 71, § 32A.

On May 20, 2004, you requested the Bedford School Committee ("the School Committee") to review the Superintendent's decision under 603 C.M.R. 5.03(3). After a meeting, which both you and the Superintendent attended, the School Committee voted unanimously to uphold the Superintendent's decision, and, on June 18, 2004, issued its final local decision, pursuant to 603 C.M.R. 5.03(4). On June 29, 2004, you filed this request pursuant to 603 CMR 5.04, requesting my review of the decision issued by the Bedford School Committee.

General Laws c. 71, § 32A, the Parental Notification Law, states in relevant part:

> Every city, town, regional school district or vocational school district implementing or maintaining curriculum which primarily involves human sexual education or human sexuality issues shall adopt a policy ensuring parental/guardian notification. Such policy shall afford parents or guardians the flexibility to exempt their children from any portion of said curriculum through written notification to the school principal. No child so exempted shall be penalized by reason of such exemption.
>
> . . .
>
> The department of education shall promulgate regulations for adjudicatory proceedings to resolve any and all disputes arising under this section.

G.L. c. 71, § 32A.

The Board of Education promulgated regulations under the statute, which are codified at 603 C.M.R. 5.00. The regulations provide, in relevant part:

> A parent who is dissatisfied with an action or decision of the superintendent under G.L. c. 71, § 32A may submit a written request to the school committee for review of the issue.
>
> The school committee shall review the issue and provide the parent with a timely written decision within 30 days of the request, unless extenuating circumstances require a delay.
>
> . . .
>
> A parent who is dissatisfied with the final local decision on an issue arising under G.L. c. 71, § 32A may submit a written request for review to the Commissioner, within 15 days of the date of the final local decision. The written request shall specify the basis on which the parent alleges the school or school district has not met the requirements of G.L. c. 71, § 32A and shall include a copy of the final local decision and any other relevant correspondence.

603 C.M.R. 5.03(3); 5.03(4) and 5.04(1).

The first issue raised by you for review is the skit portraying a homosexual student that was part of a November 24, 2003 mandatory school-wide assembly. As noted above, G.L. c. 71, § 32A requires each school committee to adopt and publish a policy ensuring that parents are notified about, and permitted to exempt their children from, any "curriculum that primarily involves

human sexual education or human sexuality issues." The Department has interpreted this phrase to apply to courses, school assemblies, or other instructional activities and programs that students are scheduled to attend during the school day, and that focus on human sexual education, the biological mechanics of human reproduction and sexual development, or human sexuality issues.

Although the skits performed at the school-wide assembly held on November 24, 2003 may be considered "curricula" for the purpose of G.L. c. 71, § 32A, since attendance at the assembly was mandatory and the skits were instructional in nature, they were not "curricul[a] that primarily involves human sexual education or human sexuality issues." The assembly was part of a "Day of Respect," the purpose of which, according to the school, was to promote tolerance and respect for every student, including students, such as gay and lesbian students and disabled students, who are often viewed as different by other students. Thus, the purpose of the skits was to provide instruction on tolerance, not issues of human sexuality. The skit at issue dealt with social obstacles that homosexual students may face at school. There is no evidence, and you do not suggest, that the skit included direct discussion of human sexuality issues and/or, specifically, homosexual relationships. The mere reference to the fact of homosexuality or the portrayal of a homosexual student, without further instruction or discussion of the physical and sexual implications of homosexuality, does not constitute instruction about "the biological mechanics of human reproduction and sexual development, or human sexuality issues." Based on these facts, I conclude that the skit did not require parental notification under G.L. c. 71, § 32A.

Likewise, the school's display of the rainbow flag also falls outside the notification requirements of G.L. c. 71, § 32A. There appears to be no dispute that the flag was intended to reference homosexuality and to constitute a symbol of tolerance for gay and lesbian students. However, the display of such a flag in the main corridor of the school does not constitute a "curriculum" for the purposes of G.L. c. 71, § 32A. A flag is not a course, an assembly, or an activity, unless students are required to study it and attend instruction about it. Moreover, even assuming that the flag display did meet the definition of a "curriculum," it still would not require parental notification pursuant to G.L. c. 71, § 32A, because, similar to the skit, it is at most a reference to, or symbol of, homosexuality, and does not constitute instruction on human sexuality issues.

You also allege that the school failed to comply with your request to exempt your daughters from instruction on human sexuality issues, insofar as the school permitted the rainbow flag to remain hanging in the school corridor, as part of a larger flag exhibit, after the receipt of your March 22, 2004 letter. For the reasons stated above, I have determined that the display of the rainbow flag does not constitute curriculum primarily involving human sexual education or human sexuality issues for purposes of G.L. c. 71, § 32A. Thus, the school was not required to remove the flag upon receipt of your March 22, 2004 letter.

Finally, you allege procedural flaws in the School Committee's meeting on June 15, 2004. Both you and the Superintendent attended the meeting, at which you were permitted to present your position on the school's actions. You contend that the fact that the Superintendent sat with School Committee members at the meeting held to review your complaint indicates collusion

and that the Superintendent improperly influenced the School Committee's final decision. Bedford does not dispute that the Superintendent sat with the School Committee members at the meeting. Nothing in 603 C.M.R. 5.00, however, prescribes the form in which the School Committee must "review the issue and provide the parents with a timely written decision." 603 C.M.R. 5.03(4). Indeed, the regulation does not require the School Committee's review to include a formal meeting. As 603 C.M.R. 5.03 does not prescribe the form in which the School Committee is charged with reviewing the Superintendent's decision under G.L. c. 71, § 32A, there is no regulatory violation. Nor can I determine that the School Committee acted in bad faith or with collusion based on the fact that the Superintendent sat with the School Committee members at the meeting. The seating arrangement may have been designed to allow the Superintendent efficiently to testify or to provide information to the School Committee members, or for some other legitimate purpose. Public officials enjoy a presumption of good faith in carrying out their duties. Slocum v. City of Medford, 302 Mass. 251, 255 (1939). No evidence has been presented to rebut the presumption that the Superintendent and the School Committee acted in good faith during their meeting on June 15, 2004. Further, the School Committee's written decision, issued on June 18, 2004, does not provide any basis for a conclusion that the School Committee was improperly influenced by the Superintendent in rendering its decision.

Based on my review of the documentation you have submitted and the analysis above, I conclude that Bedford did not violate G.L. c. 71, § 32A in regard to the display of the rainbow flag, its sponsorship of a skit regarding a homosexual student, or its response to your March 22, 2004 request for exemption of your daughters from instruction regarding human sexuality issues. This is the final agency decision for purposes of 603 C.M.R. 5.04(4).

Sincerely,

David P. Driscoll
Commissioner of Education

c: Dr. Maureen Lacroix, Superintendent, Bedford Public Schools
Anne Bickford, Chairwoman, Bedford School Committee
Elizabeth Keliher, Legal Office
John Bynoe, Associate Commissioner, Student Support Services
John Stager, Director of Program Quality Assurance Services