UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | | |
|---|---|---|
| DAVID PARKER, TONIA PARKER, Individually and as next friends and guardians of Jacob Parker and Joshua Parker, JACOB PARKER, JOSHUA PARKER, | ) ) ) | 06-CV-10751-MLW |
| | ) | |
| JOSEPH ROBERT WIRTHLIN, ROBIN WIRTHLIN, Individually and as next friends and guardians of Joseph Robert Wirthlin, Jr., JOSEPH ROBERT WIRTHLIN, Jr., | ) ) ) ) | |
| | ) | **PLAINTIFF'S** |
| PLAINTIFFS | ) | **OPPOSITION TO** |
| vs. | ) | **DEFENDANTS'** |
| | ) | **MOTION TO DISMISS** |
| WILLIAM HURLEY, PAUL B. ASH, PH.D, Individually and as Superintendents of the Town of Lexington Public Schools, | ) ) ) | |
| | ) | |
| HELEN LUTTON COHEN, THOMAS R. DIAZ, OLGA GUTTAG, SCOTT BURSON, THOMAS GRIFFITH, Individually and as members of the Town of Lexington School Committee, | ) ) ) ) | |
| | ) | |
| ANDRE RAVENELLE, Individually and as Director of Education of the Town of Lexington, | ) ) | |
| | ) | |
| JONI JAY, Individually and as Principal of the Estabrook Elementary School, | ) ) | |
| | ) | |
| JENNIFER WOLFRUM, Individually and as Coordinator of Health Education, | ) ) | |
| | ) | |
| HEATHER KRAMER, Individually and as a Teacher at the Estabrook Elementary School, and | ) ) | |
| | ) | |
| TOWN OF LEXINGTON, | ) | |
| | ) | |
| DEFENDANTS | ) | |

_____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

DAVID PARKER, et al.,                  )
     Plaintiffs                         )
                                           )
v.                                     )
                                           )     NO:     06-CV-10751-MLW
TOWN OF LEXINGTON, et al.,              )
     Defendants                         )
_____)

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS (AND OUTLINE)**

STATEMENT.............................................................................................................................1

ARGUMENT.............................................................................................................................3

INTRODUCTION......................................................................................................................3

STANDARD OF REVIEW........................................................................................................5

I. THE SCHOOL'S ACTIONS HAVE INVADED THE PARENTS'
HYBRID  RIGHTS TO "DIRECT THE UPBRINGING OF THEIR
CHILDREN" AND TO THE FREE EXERCISE OF THEIR
RELIGION......................................6

    A. Lexington Has Intruded Upon the Fundamental Right of All
    Parents to Direct the Upbringing of Their Children............................................6

    B. The School's Actions Invade the Familial "Zone of
    Privacy".................................................................................................................1
    1

    C. The School's Actions Impinge Upon the Plaintiffs' Free
    Exercise of Religion...........................................................................................13

II. THE GOOD FAITH ALLEGATION OF A "HYBRID RIGHTS"
DEPRIVATION SUBJECTS THE CONDUCT TO "STRICT SCRUTINY"
AND REQUIRES THE STATE ACTORS TO DEMONSTRATE A
COMPELLING INTEREST IN THEIR

BEHAVIOR...................................................................16

    A. Hybrid Rights Have Been Successfully Asserted Against
School Districts ................................................................................................................17

    B. The Age of the Children in Question Compels "Strict Scrutiny"................................20

    C. Lexington's Choice of Material to Disseminate Must Be
Viewed as Intentional and Coercive
Indoctrination...........................................................22

    D. The Privacy Rights Violation Also Mitigates in Favor of Strict
Scrutiny...........................................................................................................................23

III. A CLAIM IS STATED PURSUANT TO THE MASSACHUSETTS
CIVIL RIGHTS
ACT.................................................................................................24

IV. A CLAIM IS STATED PURSUANT TO MASS. GEN. LAWS ch. 71, §
32A......................27

    A. The Statute Is Clearly
Implicated................................................................................27

    B. A Private Right of Action Can Be Properly
Implied....................................................28

V. QUALIFIED IMMUNITY HAS ONLY LIMITED
APPLICABILITY...................................32

VI. THE CONSPIRACY CLAIM SURVIVES IF THE HYBRID
RIGHTS CLAIM SURVIVES.......................................................................................................33

CONCLUSION...........................................................................................................................33

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

DAVID PARKER, et al.,                              )
     Plaintiffs                                        )
                                     )
v.                                                 )
                                      )     NO:     06-CV-10751-MLW
TOWN OF LEXINGTON, et al.,                          )
     Defendants                                        )
_____)

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**[1]

**STATEMENT**

The plaintiffs are the parents of elementary school children.  They bring this civil rights action asserting that the Town of Lexington and several of its employees have violated a number of their fundamental constitutional rights, including the fundamental rights to direct the education and moral upbringing of their children, and the fundamental right to the free exercise of religion.

Both plaintiff families practice a Judeo-Christian faith that holds that a marriage is, by definition, a holy union between a man and a woman.  They believe as a matter of the deepest faith that other forms of "marriage" are antithetical to God's purpose for this sacred covenant.  They believe, as a matter of the deepest faith, that homosexual conduct is immoral.

The plaintiffs allege in good faith that the defendants jointly, severally, and by agreement, have chosen to "coercively indoctrinate the children into moral belief systems that are markedly different from those of their parents."  (Complaint, paras. 33, 66.)  They have also

---

[1]        Plaintiffs join in the request for oral argument.

alleged that the defendants harbor "a specific intention to denigrate their sincere and deeply held faith."  (Complaint, para. 66.)

The Parkers are the parents of two young children, ages seven (7) and five (5).  The Wirthlins also have very young children.  The plaintiff Joey Wirthlin is going into the second grade; he was seven at time of the key facts set forth in the Complaint.  At all times pertinent to the Complaint, the Parkers' eldest child attended first grade at the Estabrook Elementary School ("Estabrook") in the Town of Lexington, Massachusetts.  In or about September, 2004, at a "Back to School Night" at Estabrook, the Parkers were introduced to the idea that there would be a "Diversity Book Bag" sent home with each child during the school year, but they were not aware of the contents of the bag.[2]  This book bag commenced a course of events that led the Parkers to learn that the school and its administrators had begun a course of intentionally indoctrinating very young children into the concept that marriage between same sex couples is right and moral.  (Complaint, para. 33.)

The Parkers thereafter made reasonable requests to the school to the effect that the children be allowed to "opt-out" of this indoctrination.  The Parkers also requested to be notified in advance of any other planned human sexual education and discussion of human sexuality issues such as abortion, birth-control, pre-marital sex, or surveys, and requested the right to view any materials within the school pertaining to those topics within the reach of their child.  This request was formally denied by Superintendent Ash in December, 2005.  (Complaint, para. 35.) The Parkers' younger child is scheduled to commence kindergarten at Estabrook in September, 2006.

_____

[2]     The plaintiffs have not alleged and do not concede that these materials constitute "curriculum."

The Wirthlins' child, Joey, was in the second grade at Estabrook.  On or about Friday, March 24, 2006, the teacher in Joey's class read out loud to the students a book entitled King and King.  This book describes a romantic attraction between two men.  The protagonist is a male prince who searches for a spouse.  Several princesses are presented for him to choose from.  He rejects them all for superficial reasons, such as the fact that one has an arm longer than her other arm.  He discovers he is homosexual, falls in love and lives happily ever after with another homosexual male.[3]  The two males are graphically depicted as kissing at the end of the book.[4] (Complaint, para. 53.)

The plaintiff parents seek minimal relief.  They desire only to be notified that this type of material is to be presented, and on occasion, to be allowed to "opt out" of the adult-initiated discussions they find offensive.  They do not seek to dictate or manage curriculum, and they do not seek to influence the behavior of other children.  (Complaint, prayer for relief, pp. 22-24.)[5] They have filed this lawsuit because the Town, acting through its administrators, refuses to allow them even minimal notice.  (Complaint, paras. 45, 65.)

## ARGUMENT

## INTRODUCTION

". . . [W]here the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message."  Wooley v. Maynard, 430 U.S. 705, 716 (1977)

The Supreme Court has long held that the Fourteenth Amendment due process clause

---

[3]      Indeed, the book could be objectively and fairly viewed as actually presenting the homosexual choice as the "better" or "best" choice.

[4]      The defendants have included the last page of the book in their materials, but not the entire book.

[5]      Defendants mischaracterize the claim by repeatedly asserting that the plaintiffs seek to "dictate" curriculum.  (Def. Mem., pp. 16, 27.  References to the "Memorandum of Law in Support of Defendant's Motion to Dismiss Plaintiff's Complaint" will be cited as Def. Mem., p.__.)

protects both procedural and substantive rights.  Among the fundamental substantive rights

clearly protected are:

1.  The fundamental right of parents to "direct the [moral] upbringing of their children" Troxel v. Granville, 530 U.S. 57, 65 (2000);

2.  The fundamental right to enjoy a zone of privacy related to intimate family matters.  See M.L.B. v. S.L.J., 519 U.S. 102, 116 (1996); and

3.   The fundamental right to the free exercise of religion.  Employment Div. v. Smith, 494 U.S. 872, 876-77 (1990).

These rights are all enforceable against the states through the Fourteenth Amendment.  The

Complaint alleges that the defendant State actors have simultaneously intruded upon all three of

these rights.

When a claim of "free exercise" denial is linked with one or more of the others claims,

the allegations are said to implicate "hybrid rights."  Employment Div. v. Smith, 494 U.S. 872,

882 (1990).  A good faith allegation of a hybrid rights violation requires the court to exercise

strict scrutiny over the state's alleged justifications for its actions.  Id. at 883.

The instant facts present the quintessential "hybrid rights" situation.  The defendants'

conduct jointly and severally intrudes upon free exercise and two other clearly defined

fundamental constitutional rights.  Moreover, in creating the hybrid rights doctrine, the Supreme

Court was specifically concerned with the correlation between religion and parenthood.  Smith,

494 U.S. at 882.  This case, then, is exactly the type of case the Smith Court envisioned when it

created the hybrid rights approach.  The alleged violations must be addressed synergistically, and

can not be dismissed at this stage.

The defendants' artful memorandum seeks to divide and conquer.  It addresses the

constitutional rights separately, and locates some cases suggesting that the claim of each rights

violation alone is subjected only to the "rational relationship" test, and arguably may not have been violated.  This process misses the point entirely.  Because the Complaint is crafted as a valid "hybrid claim," the defendants' conduct must be subjected to "strict scrutiny," or at least a heightened intermediate standard of review.  Therefore, the Complaint can not be dismissed.

Section I of this memorandum will provide a brief survey of the law of each implicated fundamental right.  Section II explains why the heightened standard of review must be applied.  Subsequent sections address the other counts, and the claim of qualified immunity.

## STANDARD OF REVIEW

In reviewing a motion to dismiss, a court must view allegations and inferences broadly and in plaintiff's favor to determine if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim.  "[The court] is bound to give the [plaintiff] the benefit of every reasonable inference . . . ."  Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn, 373 U.S. 746, 754 n.6 (1963); Hobson v. McLean Hosp. Corp, 402 Mass. 413, 415 (1988).  Dismissal of a complaint is considered radical relief.  A court should therefore only allow dismissal if the plaintiff can set forth no set of facts that would entitle him to relief.  Indeed, a motion to dismiss a complaint for failure to state a claim on which relief can be granted should not be allowed unless it appears certain that the complaining party is not entitled to relief under any statement of facts that could be proved in support of the claim.  "We accept the allegations of the complaint as true, and determine whether, under any theory, the allegations are sufficient to state a cause of action in accordance with the law."  Brown v. Hot, Sexy and Safer Prod, Inc., 63 F.3d 525, 530 (1st Cir. 1995) (citing Vartanian v. Monsanto Co., 14 F.3d 697, 700 (1st Cir. 1994)); Knight v. Mills, 836 F.2d 659, 664 (1st Cir. 1987).  A complaint can not be dismissed simply "because it asserts a novel or extreme theory of liability or improbable facts."  Mun.

Light Co. v. Commonwealth, 34 Mass. App. Ct. 162, 167 (1993) (citations omitted).

As will be demonstrated below, there is nothing novel or extreme about the allegations herein. To the contrary, the plaintiffs' personal beliefs are grounded in thousands of years of tradition and faith, and the legal principles supporting their modest requests are grounded in decades of constitutional jurisprudence.

**I.     THE SCHOOL'S ACTIONS HAVE INVADED THE PARENTS' HYBRID RIGHTS TO "DIRECT THE UPBRINGING OF THEIR CHILDREN" AND TO THE FREE EXERCISE OF THEIR RELIGION**

> **A.     Lexington Has Intruded Upon the Fundamental Right of All Parents to Direct the Upbringing of Their Children**

Without a doubt, both the United States of America and the Commonwealth of Massachusetts adhere to a "basic constitutional right of parents to direct the education of their children." Brunelle v. Lynn Pub. Sch., 428 Mass. 512, 514 (1998) (citing Care & Protection of Charles, 399 Mass. 324, 334 (1987)); see Troxel v. Granville, 530 U.S. 57 (2000) Curtis v. Sch. Comm. of Falmouth, 420 Mass. 749, 754 (1995). This right is grounded in longstanding state and federal constitutional dogma. "[T]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." Epperson v. Arkansas, 393 U.S. 97, 104 (1968) (quoting Shelton v. Tucker, 364 U.S. 479, 487 (1960)).

Since 1923, if not before, the Supreme Court of the United States has recognized that parents possess a fundamental liberty interest to be free from unnecessary governmental intrusion in the rearing of their children. See Quilloin v. Walcott, 434 U.S. 246, 255 (1978); Wisconsin v. Yoder, 406 U.S. 205, 232-33 (1972); Prince v. Massachusetts, 321 U.S. 158, 166-67 (1944); Pierce v. Society of Sisters, 268 U.S. 510, 534-35 (1925); Meyer v. Nebraska, 262 U.S. 390, 399, 401 (1923). The Fourteenth Amendment protects this fundamental interest

against unnecessary state intrusion.  <u>Curtis</u>, 420 Mass. at 755.

Historical analysis of "parental rights" begins with <u>Meyer v. Nebraska</u> and <u>Pierce v. Society of Sisters</u>.  In the seminal <u>Pierce</u> decision, the Supreme Court held that the state could not pass a law requiring that all students attend public school.  The Court's reasoning is instructive:  ". . . [a] child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."  268 U.S. at 535.

The <u>Pierce</u> formulation of a "high duty" is consistent with the right of parents to direct the religious upbringing of their children.  It may even reflect a recognition that the genesis of the parental right is religious.  "The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and the upbringing of their children."  <u>Yoder</u>, 406 U.S. at 232; <u>see</u> <u>Ginsberg v. New York</u>, 390 U.S. 629, 639 (1968).

By 1972, the Supreme Court ruled that the "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.  Aspects of child rearing protected from unnecessary intrusion by the government include the inculcation of moral standards, religious beliefs, and elements of good citizenship."  <u>Yoder</u>, 406 U.S. at 232-33; <u>see</u> <u>Meyer</u>, 262 U.S. at 401; <u>Pierce</u>, 268 U.S. at 534-35.

In the year 2000, the Supreme Court reiterated the importance of this right.  "[W]e have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children."  <u>Troxel</u>, 530 U.S. at 66 (citing <u>Stanley v. Illinois</u>, 405 U.S. 645, 651 (1972)) (other citations omitted).  <u>Accord,</u> <u>Pelletier v. Maine Principals' Ass'n</u>, 261 F. Supp. 2d 10 n.8 (D. Me. 2003).  <u>Troxel</u> is the Supreme Court's most recent "parental rights" decision.  Therein, the Court reiterated that parents have a **fundamental** liberty interest to "direct the

7

upbringing and education of children under their control." <u>Id</u>. at 65 (emphasis supplied) (quoting <u>Pierce</u>, 268 U.S. at 534-35).  Moreover, because this right is vested in the Due Process Clause of the Fourteenth Amendment, it "provides **heightened** protection against government interference." <u>Id</u>. at 65 (emphasis supplied) (quoting <u>Washington v. Glucksberg</u>, 521 U.S. 702, 720 (1997).  In <u>Troxel</u>, eight justices recognized the parental right to be "fundamental."

Despite the fundamental nature of the right, the defendants assert that the Complaint fails to even **allege** a violation of this parental right.  (Def. Mem., pp. 13-15.)  To make this leap, defendants suggest that the plaintiffs seek to direct and control curriculum, and that "black letter" law prevents them from doing so.  (Def. Mem., pp. 13-15.)

This argument fails for two reasons.  First, it misstates the plaintiffs' position.  The plaintiffs do **NOT** wish to direct or control curriculum, and nothing in the Complaint makes such a request upon the court.[6]  At a minimum, they wish no more than to obtain notice that sensitive topics are being discussed.  Second, while the power and right of administrators to maintain plenary control over school curriculum is of paramount importance, it is not absolute.  The difficult questions arise when, such as here, parents wish to partake in public education, but opt out of a singular activity deemed to deeply intrude upon the parents' fundamental moral and religious duties.

Defendants' argument focuses on the First Circuit's lead "hybrid rights" case, <u>Brown v. Hot, Sexy and Safer Prods., Inc.</u>, 68 F.3d 525, 538-39 (1st Cir. 1995).  The defendants read <u>Brown</u> to suggest that despite the truly fundamental nature of the parental right, it stops dead in

---

[6]     On page sixteen of their brief, the defendants suggest that this is the case.  The memorandum reads "The right of parents to direct the upbringing of their children does not extend to the dictation of school curriculum."  Again, the plaintiffs have not alleged that the offending materials were part of the curriculum, and indeed it appears they were extra-curricular.

its tracks at the schoolhouse door.  (Def. Mem., p. 14.)  This reading goes way too far to be

asserted as a matter of black letter law requiring immediate dismissal.  To the contrary, the

courts have struggled with an articulation of the appropriate standard of review to be applied to

cases asserting parental rights to be involved in the education of their public school children.

See C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 182-83 (2005) (citations omitted).[7]  In C.N,

the Third Circuit upheld a school district's use of a survey concerning sexual behaviors to

middle and high school children finding no constitutional violation.  However, the court took

pains to point out:

> In reaching this conclusion, we do **not** hold . . . that the right of parents under the <u>Meyer-Pierce</u> rubric 'does not extend beyond the threshold of the school door.'  Nor do we endorse the categorical approach to this right taken by the <u>Fields</u> court, wherein it appears that a claim grounded in <u>Meyers-Pierce</u> will now trigger only an inquiry into whether or not the parent chose to send their child to public school and if so, then the claim will fail.

C.N., 430 F.3d at 185 n.26 (citing Fields v. Palmdale Sch. Dist., 427 F.3d 1197, 1207 (2005),

amended by and re-aff'd, 447 F.3d 1187 (9th Cir. 2006))[8] (emphasis supplied).  This is the

appropriate analysis that should be adopted here.  The school's argument that the parents have no

rights at all, other than to withdraw the children from public school, can not prevail.

Brown, like C.N., involved children far older than the plaintiffs.  The Brown court held

that requiring high school students to attend a sexually explicit aids awareness seminar violated

no constitutional rights.  This lends some support to defendants' theories, but can not control the

instant situation.

First and foremost, Brown stands as First Circuit authority for the proposition that the

---

[7]    This question is addressed thoroughly in Section II of this memorandum.

[8]    Justice Alito sat on the panel that issued this ruling.

9

"hybrid rights" doctrine exists and has vitality.[9]  <u>Brown</u>, 68 F.3d at 538-39.  Thus, <u>Brown</u>

recognizes, as it must, that the Supreme Court requires that if a "free exercise" claim is linked

with another claim of a fundamental right, the heightened standard of review must apply.  (<u>See</u>

Section II, <u>infra</u>.)  Although the <u>Brown</u> court did not apply a heightened standard of review to

the parent's fundamental claim, this is not surprising; <u>Brown</u> was issued in 1996, a full four

years before <u>Troxel</u> firmly and finally held that the parental right to direct the moral upbringing

of children was indeed "fundamental."  Thus, while <u>Brown</u> might well reach the same result on

its facts today, the holding has only limited precedential value here, where the children are far

younger, and the claim is one of intentional religious and moral indoctrination.  (Complaint,

p.31-35, 65-66)

      The allegation of indoctrination distinguishes this case from others where the mere

teaching of uncomfortable facts is placed in issue.  In <u>C.N.</u>, the court held that submission of a

survey to high schoolers did not implicate the Constitution, even though some parents were

deeply offended by the sensitive nature of some of the questions.  430 F.3d at 190.  To reach this

particular result, the <u>C.N.</u> court felt compelled to note that the "School Defendants **in no way**

**indoctrinated** the students in any particular outlook on these sensitive topics . . . ."  <u>Id.</u> at 185.

(Emphasis supplied.)  The obvious implication is that the result would have been otherwise if

indoctrination were proven.  The case was decided on a fully developed record.

      Here, however, intentional indoctrination is carefully pled, and supported by hard facts.

(Complaint, paras. 31-35.)  Thus, the complaint can not be dismissed at the 12(b)(6) stage.

      Finally, the plaintiffs assert that the legitimacy and strength of the parental interest at

---

[9]     The defendants have conceded this important point, although they buried their concession in a footnote.
(Def. Memo, p. 10, n.28.)

stake has been recognized by the Commonwealth of Massachusetts.  The statutory rights

inherent in Mass. Gen. Laws ch. 71, § 32A create a liberty interest that is actionable as a civil

rights violation.  Although a separate claim is pled under the statute, the defendants assert there

is no private right of action.  Whether or not such a private right exists, the statute informs the

Section 1983 claim as well.  It is discussed in more detail <u>infra</u>.

For all of the above reasons, it is clear that the Complaint contains an allegation that the

defendants have intruded upon a fundamental constitutional right worthy of judicial inquiry and

can not be dismissed.

**B.       The School's Actions Invade the Familial "Zone of Privacy"**

Both the United States Supreme Court and the Supreme Judicial Court have emphasized,

in connection with the protected right of parents to raise their children, that there exists a

"private realm of family life which the state cannot enter."  <u>Prince</u>, 321 U.S. at 166-67; <u>see</u>

<u>Moore v. Cleveland</u>, 431 U.S. 494, 499 (1977); <u>Brunelle v. Lynn Pub. Sch.</u>, 428 Mass. 512, 518-

19 (1998); <u>Curtis</u>, 420 Mass. at 756, n.8, and cases cited.[10]  The constitutional right of privacy is

not well defined.  The Supreme Court has discerned certain "zones of privacy" emanating from

the amendments to the Constitution.  <u>Roe v. Wade</u>, 410 U.S. 113, 152-53 (1973), often discussed

in the media without careful reflection upon its precise language, contains a thorough discussion

of the origins of this right.  That a core privacy right exists to some extent can no longer be

seriously contested.  <u>See</u> <u>M.L.B. v. S.L.J.</u>, 519 U.S. 102, 116 (1996); <u>Roe</u>, 410 U.S. at 152-53

(1973); <u>Griswald v. Connecticut</u>, 381 U.S. 479, 516 (1965); <u>C.N.</u>, 430 F.3d at 185.  The "right to

be let alone" has been recognized by the Supreme Court as "'the most comprehensive of rights

---

[10]      As noted above, within this realm of privacy is the notion that parents have a "fundamental right to make
decisions concerning the care, custody and control of their children."  <u>Troxel</u>, 530 U.S. at 66.

and the right most valued by civilized men.'" Harper v. Poway Unified Sch. Dist., 445 F.3d 1166, 1178 (9th Cir. 2006) (citing Hill v. Colorado, 530 U.S. 703, 716-17 (2000) (quoting Olmstead v. United States, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting))).

Analysis of post Roe cases reveals that the Court has apparently recognized that the constitutional right to privacy "protects two types of privacy interests: 'One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions.'" Hedges v. Musco, 204 F.3d 109, 121 (3d Cir. 2000) (quoting Whalen v. Roe, 429 U.S. 589, 599-600 (1977) (footnote omitted)). See also Sterling v. Borough of Minersville, 232 F.3d 190, 193-96 n.22 (3d Cir. 2000). The "important decisions" referred to in the latter strand of the privacy protection cases "have encompassed 'matters relating to marriage, procreation, contraception, family relationships, and child rearing and education.'" United States v. Westinghouse Elec. Corp., 638 F.2d 570, 577 (3d Cir. 1980) (quoting Paul v. Davis, 424 U.S. 693, 713 (1976)). The spiritual underpinnings of the marriage relationship and the moral responsibilities inherent in sexual relationships generally clearly fall within the ambit of the zone of privacy.

The defense argues that neither the Parkers nor the Wirthlins are compelled to change their beliefs and are free to raise their children as they see fit. (Def. Mem., p. 12.) This argument misses the point of the entire case. Because of the young age of the children, the State is, in essence, intentionally attempting to prevent the parents from raising their children as they see fit. The State is seeking to teach the children that their core private family belief system is wrong, and they are doing it behind the parents' backs. The Complaint specifically alleges that "[y]oung children of the ages of the two Parker children are far more susceptible to indoctrination and persuasion than are children even a few years older." (Complaint, para. 42.)

12

The privacy rights are clearly implicated.

    **C.**    **The School's Actions Impinge Upon the Plaintiffs' Free Exercise of Religion**

Fourteenth Amendment free exercise jurisprudence commences with Cantwell v. Connecticut, 310 U.S. 296 (1940).  Therein, the Court "incorporated" the Free Exercise Clause against the states through the Due Process Clause of the Fourteenth Amendment.  Cantwell was actually a criminal case.  The appellant Jehovah's Witnesses had distributed religious materials and proselytized thought the defendant city.  They were convicted of violating a city ordinance. At the Supreme Court, they asserted that their convictions violated the Fourteenth Amendment rights to free speech and free exercise.  Id. at 302.

Cantwell is a seminal decision because the Court held that a citizen's free exercise rights could require exemption from otherwise pertinent laws.  Id. at 303-04.  Of course, the Court also had to protect the government against a wholesale inability to administer its police powers. The Court therefore created a balancing test.  Subsequent to Cantwell, the federal courts would be required to balance the governmental interest in protecting the "peace, good order and comfort" of society against the asserted liberty interest of the religious adherent.[11]

Shortly after Cantwell, the Court decided Sherbert v. Verner, 374 U.S. 398 (1963). Therein, the Court protected a Seventh-Day Adventist who was fired because she refused to work on Saturday.  After her termination, she applied for unemployment compensation.  At the time, South Carolina had a statutory requirement that applicants for unemployment benefits be willing to work on Saturday.  The appellant's claim for compensation was therefore denied.

_____

[11]    While Cantwell is often regarded as a free exercise case, it is should be noted that a careful reading suggests that the defendants' free speech rights also were important.

However, at the Supreme Court, the state could not demonstrate that its work requirement was justified by a compelling state interest; thus, the Court ruled that the Free Exercise Clause required the state to grant the plaintiff an exemption.  Wisconsin v. Yoder, mentioned above as a case supporting the parental right to direct the moral upbringing of their children, is also a  free exercise case. The Court ruled in Yoder that Amish parents are not required to send their children to public high school.

First Amendment protection against state intrusion into the "free exercise" of religion was arguably dealt a blow in the seminal decision Employment Div. v. Smith, 494 U.S. 872 (1990).  In Smith, the Court was required to determine whether a violation of Oregon drug laws that proscribed use of peyote in religious services could serve as the basis to deny unemployment benefits.  The Court retreated from the broader Cantwell formulation and applied the "rational relationship" test to validate the legislation.  However, the Court did not overrule the earlier cases such as Meyer, Pierce, and Yoder, which utilized a "strict scrutiny" test to void state statutes that unnecessarily intruded upon the free exercise of religion.  Distinguishing these cases in Smith, the Court stated that "[t]he only decisions in which we have held the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections . . . ."  Smith, 494 U.S. at 881.  The Court ruled that heightened scrutiny should be applied to the "hybrid situation" where "the interests of parenthood are combined with a free exercise claim."  Id. at 882 n.1 (quoting Yoder, 406 U.S. at 223).

Subsequently, courts and commentators have referred to this passage in Smith as the inception of a "hybrid rights" doctrine.  This doctrine mandates heightened scrutiny of legislation or state action where free exercise of religion and other key rights, including parental

14

rights, are joined.  Brown, 68 F.3d at 539; Civil Liberties for Urban Believers v. City of Chicago,

342 F.3d 752, 765 (7th Cir. 2003); Tenafly Eruv Ass'n v. Borough of Tenafly, 309 F.3d 144, 165

n.26 (3d Cir. 2002); Salvation Army v. Dep't of Cmty. Affairs, 919 F.2d 183, 195-97 (3d Cir.

1990); Littlefield v. Forney Indep. Sch. Dist., 108 F. Supp. 2d 681, 706 (N.D. Tex. 2000); Hicks

v. Halifax County Bd. of Educ., 93 F. Supp. 2d 649, 663 (E.D.N.C. 1999).[12]

The defendants assert that their promulgation of textbooks is facially neutral.  However,

the Supreme Court in Church of Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520 (1993),

has stated:

> Facial neutrality is not determinative.  The Free Exercise Clause, like the Establishment
> Clause, extends beyond facial discrimination.  The Clause "forbids subtle departures
> from neutrality," Gillette v. United States, 401 U.S. 437, 452, 28 L. Ed. 2d 168, 91 S. Ct.
> 828 (1971), and "covert suppression of particular religious beliefs," Bowen v. Roy,
> supra, at 703 (opinion of Burger, C. J.).  Official action that targets religious conduct for
> distinctive treatment cannot be shielded by mere compliance with the requirement of
> facial neutrality.  The Free Exercise Clause protects against governmental hostility which
> is masked as well as overt.

Id. at 532.  This covert action is exactly the conduct that has been well-pled.

For these reasons, the free exercise clause has been implicated and the case can not be

dismissed per Rule 12(b)(6).[13]

## II.     THE GOOD FAITH ALLEGATION OF A "HYBRID RIGHTS" DEPRIVATION
## SUBJECTS THE CONDUCT TO "STRICT SCRUTINY" AND REQUIRES THE STATE

---

[12]     The "hybrid rights" doctrine has been subjected to criticism but remains good law.  See, Steven H. Aden &
Lee J. Stang, When a "Rule" Doesn't Rule:  The Failure of the Oregon Employment Division v. Smith Hybrid
Rights Exception, 108 Penn. St. L. Rev. 573 (2003).

[13]     The claim that the defendants have covertly denigrated the plaintiffs' Christian faith could also be viewed
as a violation of the "establishment clause."  In an effort to be succinct and plead the most pertinent clauses, no
separate claim has been asserted under the "establishment clause," as such.  The cases appear to suggest that
establishment clauses cases "for the most part have addressed governmental efforts to benefit religion or particular
religions," and thus allegations of an "attempt to disfavor" a religion, such as here are "properly analyzed under the
Free Exercise Clause."  Harper, 445 F.3d at 1190 (citing Lukumi, 508 U.S. at 532).  Lukumi states that, at a
minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all
religious beliefs.  Lukumi, 508 U.S. at 532.

**ACTORS TO DEMONSTRATE A COMPELLING INTEREST IN THEIR BEHAVIOR**

Because three fundamental rights are simultaneously implicated, the Town's actions are to be subjected to "strict scrutiny."  Such scrutiny can not be applied as a pure matter of law. Dismissal is therefore not warranted.

Defendants suggest that the plaintiffs could choose private school.  (Def. Mem., p. 14.) "This is the most vulgar of ultimatums - either your child can receive a public education or she can continue to faithfully practice her religion, but not both."  Michael E. Lechliter, The Free Exercise of Religion and Public Schools:  The Implications of Hybrid Rights on the Religious Upbringing of Children, 103 Mich. L. Rev. 2209, 2236 (2005).

As demonstrated in Section I, supra, the "hybrid rights" doctrine was created to preserve earlier precedent.  Smith, 494 U.S. at 887-81.  The Court in Smith articulated a bright line rule for the basic free exercise case, where religion alone is implicated and used as an excuse to defeat prosecution of a crime.  However, the Supreme Court made explicitly clear that its previous free exercise jurisprudence requiring strict scrutiny where parental rights were implicated remained undisturbed.  Id. at 882.[14]

As demonstrated above, in Brown, the First Circuit recognized that the hybrid rights doctrine was the law of the land,[15] but had not yet received the Supreme Court's guidance on the fundamental nature of the parental right in question that was reaffirmed in Troxel four years later.

The Troxel plurality did not specifically address which standard of review to apply to "hybrid" cases.  In Troxel, Justice Thomas noted that while the opinions of Justice Kennedy and

---

[14]     Defendants are correct that not every court sees the standard this clearly.

[15]     Defendants concede this point.  (Def. Mem., p. 10, n. 28.)

Justice Souter appropriately find that parents have this fundamental right, "curiously none of them articulates the appropriate standard of review." 530 U.S. at 80. Justice Thomas grabbed the bull by the horns and urged that the standard should be "strict scrutiny." He was the only one of the nine Justices to clearly enunciate an appropriate standard. However, Justice O'Connor noted that if a parental right "becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination." Id. at 70.[16]

Given that Troxel re-emphasized the fundamental nature of the parental right even after the ground swell of criticism over the Smith decision, the logical conclusion is that in cases where the free exercise claim is combined with a parental interest in directing the upbringing of children, at least five justices would support a higher standard of review than rational basis. Set forth below are four reasons why strict scrutiny should apply here:

A.    The hybrid rights doctrine has been successfully asserted in other cases;

B.    The age of the children is paramount;

C.    Intentional indoctrination is well pled; and

D.    The separate right of privacy must also be considered.

These reasons will be discussed below, seriatim.

**A.    Hybrid Rights Have Been Successfully Asserted Against School Districts**

Contrary to the assertions in defendants' memorandum, several courts throughout the country have issued thoughtful opinions applying strict scrutiny to hybrid claims against schools and school districts in the correct manner described above. While the facts of these cases are disparate, each stands as an exemplar of how courts have properly applied "hybrid rights" claims

---

[16]    Justice O'Connor provided no further explanation of what she means by the phrase "at least some special weight."

17

in accord with the Supreme Court's mandate.

In <u>Hicks v. Halifax County Board of Education</u>, 93 F. Supp. 2d 649 (E.D.N.C. 1999), the plaintiffs challenged a school uniform policy. The policy was quite neutral; students were to wear blue shirts and khakis. The plaintiff had nothing against the blue shirts and khakis but, as a matter of religious faith, resented the concept of uniformity in general. She felt "adherence to the uniform policy would violate her basic religious beliefs" and would promote "an allegiance to the spirit of the anti-Christ." <u>Id.</u> at 653. The plaintiff asserted a hybrid claim based on free exercise and her due process right to direct the upbringing of her child. Construing the plaintiffs' liberty interest as the parental right to "send her child to school without a uniform . . . [in] her effort to direct the child's moral and religious upbringing," the court found that the plaintiff [had] alleged "a genuine claim, supported by evidence in the record." <u>Id.</u> at 659. The court held that the second companion claim need not be independently viable. Instead, a plaintiff need only bring to the table the "mere presence of the [second protected] interest, as a genuine claim" to trigger the heightened scrutiny occasioned by hybrid claims. <u>Id</u> at 662. The court therefore rejected the defendants' motion for summary judgment.

In their memorandum, defendants incorrectly cite this litigation for the exact opposite of its holding. (Def. Mem., p. 17.) They refer to <u>Hicks v. Halifax Cty. Bd. of Ed.</u>, 1999 WL 1940002 (E.D.N.C. 1999). This decision was merely an order upon a preliminary injunction request entered ten months <u>before</u> the dispositive summary judgment ruling. It was expressly overturned in the published summary judgment opinion several months later. Addressing its earlier ruling, the court stated:

> Because the court concluded that plaintiffs had not shown a substantial burden at the time
> of the preliminary injunction motion, there was no need to determine whether the hybrid-
> rights exception in <u>Smith</u> applied…. In light of the comprehensive materials submitted

18

with the parties' briefing of the motion for summary judgment and opposition thereto, the
court concludes that plaintiffs have now raised a genuine issue of material fact as to the
nature of the burden imposed upon their free exercise of religion by the school uniform
policy.  [T]he plaintiffs' showing of a genuine claim of infringement of a constitutional
interest identified in <u>Smith</u>'s hybrid-rights passage and their presentation of a record that
provides evidence supporting that claim <u>are sufficient to invoke the hybrid-rights
exception</u> to <u>Smith</u>'s general rule.

<u>Hicks</u>, 93 F. Supp 2d. at 656 (emphasis supplied).

In <u>Alabama & Coushatta Tribes of Texas v. Tr. of the Big Sandy Indep. Sch. Dist.</u>, 817 F.

Supp. 2d 1319 (E.D. Tex. 1993), the plaintiffs were Native American school children.  The

school had enacted a prohibition upon the length of hair on boys.  The plaintiffs claimed that this

code conflicted with and burdened the boys' ability to practice their deeply held and sincere

faith, and the ability of the students' parents to educate and raise their children in the traditional

religion.  The court ruled that the plaintiffs had a valid hybrid claim consisting of "free exercise"

and a parental right to direct the upbringing of their children, and free speech.

<u>Chalifoux v. New Caney Indep. Sch. Dist.</u>, 976 F. Supp. 659 (S.D. Tex. 1997) is yet

another example of a successful plaintiff's hybrid claim.  Therein, students challenged a school

rule that forbid their wearing rosaries as necklaces in school.  The school's rationale was that the

rosaries could be gang symbols.  The plaintiffs' sincerity in their beliefs was uncontested. The

court found that the plaintiffs had presented a valid hybrid claim comprised of free exercise and

free speech causes of action.  Therefore, the proper inquiry was held to be whether the school

district's rule bore "more than a 'reasonable relation' to [the district's] stated objective."

<u>Chalifoux</u>, 976 F. Supp. at 671. The holding was that the prohibition on wearing rosaries

violated the plaintiffs' free exercise rights.

Still another hybrid claim was successful in <u>People v. DeJonge</u>, 501 N.W. 2d. 127 (Mich.

1993).  Therein, two Roman Catholic parents sought an exemption to a state requirement that

home-schooled teachers obtain certification similar to public school teachers.  The Michigan

Supreme Court applied strict scrutiny to the claim because the plaintiffs had implicated two

rights:  free exercise and the <u>Pierce</u> parental right to direct the education of their children.  The

court went on to rule that the state's interest in certification of home-school teachers was not

essential to its interest in the education of its citizens.  Moreover, the court also found that the

means chosen by Michigan to ensure a properly educated citizenry was more intrusive than

necessary.  Thus, the plaintiffs prevailed and obtained an exemption from the certification

requirement. It is clear that many courts throughout the country have correctly applied the hybrid

rights analysis.

      B.      **<u>The Age of the Children in Question Compels "Strict Scrutiny"</u>**

Of crucial importance to this case is the extraordinarily young age of the children whose

own rights are also well pled.  "Introducing a child to sensitive topics before a parent might have

done so herself can complicate and even **undermine parental authority**."  <u>C.N.</u>, 430 F.3d at

185 (emphasis supplied).  It is not educators, but parents who have primary rights in the

upbringing of children.  <u>Gruenke v. Seip</u>, 225 F.3d 290, 307 (3d Cir. 2000).  School officials

have only a secondary responsibility and must respect the rights of parents.  <u>Id</u>.  Indeed, it is for

precisely this reason that the plaintiffs insist upon their right to limit the State's power to

indoctrinate.

The Supreme Court has often recognized that age is a crucial factor in First Amendment

jurisprudence.  There are heightened concerns with protecting freedom of conscience from subtle

coercive pressure in the elementary and secondary public schools.  <u>See, e.g.</u>, <u>Board of Ed. of</u>

<u>Westside Cmty. Sch. (Dist. 66) v. Mergens</u>, 496 U.S. 226, 261-62 (1990) (Kennedy, J.,

concurring); <u>Edwards v. Aguillard</u>, 482 U.S. 578, 584 (1987); <u>Sch. Dist. of Abington v.</u>

20

Schempp, 374 U.S. 203, 307 (1963) (Goldberg, J., concurring).  Allegations of First Amendment

violations in elementary school settings "present heightened concerns for courts."  Sherman v.

Cmty. Consol. Sch. Dist. 21, 8 F.3d 1160, 1164 (1993) (establishment clause allegation).  In

Grand Rapids Sch. Dist. v. Ball, 473 U.S. 373, 390 (1985), the Court stated:  "The symbolism of

a union between church and state is most likely to influence children of tender years, whose

experience is limited and whose beliefs consequently are the function of environment as much as

free and voluntary choice."  See also Lee v. Weisman, 505 U.S. 577, 592 (1992) (noting

heightened concerns of "subtle coercive pressure In the elementary public schools.")  "The

process of inculcating religious doctrine is of course enhanced by the impressionable age of the

pupils, in primary schools particularly."  Lemon v. Kurtzman, 403 U.S. 602, 616 (1971) (striking

down salary aid to parochial school teachers as establishment clause violation.)  "What may

appear to some to be essential to good citizenship might well for others border on or constitute

instruction in religion."  Id. at 619.[17]

A high school student has far greater ability to process and scrutinize information than

does a very young child.  Indeed, the fact that the children in this case are so young itself gives

rise to a compelling inference that the State's intention is indoctrination.

C.    **Lexington's Choice of Material to Disseminate Must Be Viewed as**
      **Intentional and Coercive Indoctrination**

There is nothing voluntary about a five-, six- or seven-year-old attending the early grades

of elementary school.  School and classroom attendance in this Commonwealth is compulsory.

---

[17]    Many of the cases cited in this section involve "establishment clause" challenges.  The plaintiffs'
Complaint in this case does not directly implicate the establishment clause.  However, the defendants' elevation of
secular humanism over the plaintiffs' private religious views is analogous in some ways to an "establishment
clause" violation.  The "establishment clause" dogma is therefore useful even if not alone dispositive.  See note 12,
p. 15, supra.

The defendants' brief ignores the fact that the Complaint alleges a specific intent to coercively indoctrinate. (Complaint, paras. 25, 56.) The plaintiffs have alleged "an intentional campaign to teach the . . . families' very young child that the family's religious faith was incorrect." Id. Moreover, it is alleged that the defendants' choice of material was made with the "specific intention to indoctrinate." (Complaint, paras. 30, 66.) The defendants harbor a "specific intention to coercively indoctrinate the children into moral belief systems that are markedly different from those of their parents, and the defendants harbor a specific intention to denigrate the Wirthlins' sincere and deeply held faith. (Complaint, para. 66.)

Moreover, the Complaint alleges specific factual bases for this theory. The Complaint alleges that the administrators were influenced by a political organization and that the defendants intentionally adopted its views. It is alleged:

> On information and belief, the purpose of adopting these suggestions is the **specific intention to indoctrinate young children** into the concept that homosexuality and marriage between same-sex partners is moral and accepted, and that those who hold a faith such as the Parkers are incorrect in their beliefs. Essentially, the defendants are requiring the minor plaintiffs to affirm a belief inconsistent with and prohibited by their religion. Such indoctrination is inconsistent with the Parkers' sincere and deeply held religious faith. (Complaint, para. 33.) (Emphasis added.)[18]

"The courts recognize that public school students are particularly vulnerable to the inculcation of orthodoxy in the guise of pedagogy." Cole v. Maine Sch. Admin. Dist. One, 350 F. Supp. 2d 143, 150 (D. Me. 2004)[19] "'In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate . . . (school) officials cannot suppress expressions of feeling with which they do not wish to contend.'" Tinker v. Des

---

[18]     Similar allegations were made by the Wirthlins. (Complaint, para. 66.)

[19]     The teaching of "diversity" is now an orthodoxy. Plaintiffs agree that "diversity" in the abstract is an important goal. (See Def. Mem. pp. 4-8) Defendants' subjective interpretation of this goal cannot trump the important Constitutional questions raised here, as a matter of law.

Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 511 (1969) (quoting Burnside v. Byars, 363 F.2d

744, 749 (5th Cir. 1966)).

Lexington has argued that the materials it disseminates are facially neutral.  This does not

end the inquiry.  Facial neutrality is not determinative.  Lukumi, 508 U.S. at 532.  Thus,

defendants' claim can not be asserted as purely as one of law.  State deference to parental control

over children is underscored by the court's admonitions that "the child is not the mere creature of

the State," Pierce, 268 U.S. at 535, and that it is the parents' responsibility to inculcate "moral

standards, religious beliefs, and elements of good citizenship."  Yoder, 406 U.S. at 233.  The

fundamental theory of liberty upon which all governments in this Union repose excludes any

general power of the state to "standardize" its children.  Id. at 233.

The state actors do not really dispute their intentions.[20]  To the precise contrary, they

seem to assert that their intentional conduct is mandated by public education law and somehow

implicates health concerns.  (Def. Mem., pp. 7-8.)  In so doing, they are sidestepping the legal

questions raised by the plaintiffs.  The case does not implicate the entire curriculum; the case

only requires notice where moral indoctrination of very young children is being aggressively

pursued.

> **D.**   **The Privacy Rights Violation Also Mitigates in Favor of Strict Scrutiny**

It must be emphasized that the parental concern here relates in part to the religious

definition of marriage.

> Marriage is a coming together for better or for worse, hopefully enduring, and intimate to
> the degree of being **sacred.**  It is an association that promotes a way of life, not causes; a
> harmony in living, not political faiths; a bilateral loyalty, not commercial or social
> projects.  Yet it is an association for as noble a purpose as any. . . .

---

[20]   Even if they did, a question of intent is almost always a question of fact.

Griswald v. Connecticut, 381 U.S. 479, 516 (1965) (emphasis supplied).

Choices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as "'of basic importance in our society,' rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." M.L.B. v. S.L.J., 519 U.S. 102, 116 (1996) (quoting Boddie v. Connecticut, 401 U.S. 371, 376 (1971)). The plaintiffs respect that their religious views of marriage may differ from the majority view in their state and community. They recognize as well the State's secular power to define marriage is far more expansive than their privately held faith. The "recognizable privacy interest in avoiding unwanted communication" is perhaps most important "when persons are 'powerless to avoid' it." Hill v. Colorado, 530 U.S. 703, 716 (2000) (quoting Cohen v. California, 403 U.S. 15, 21-22 (1971). Short of leaving the school, the young children named as plaintiffs are powerless to avoid the unwanted communications.

For all of the above reasons, it is clear that strict scrutiny should be applied to the "hybrid rights" claim that has been carefully pleaded. Thus, 12(b)6 relief is unavailable.

## III.    A CLAIM IS STATED PURSUANT TO THE MASSACHUSETTS CIVIL RIGHTS ACT[21]

The Massachusetts Civil Rights Act (MCRA) is often construed similarly to the federal Civil Rights Act. Thus, if the above analysis applies under Section 1983, a claim is also stated under the Massachusetts statute.

Furthermore, the Massachusetts Constitution is "more protective of . . . religious freedoms . . . than the United States Constitution, and that the proper standard of review to be

---

[21]    Plaintiffs acknowledge that the MCRA claim against the municipality does not survive.

applied to the infringement of such freedoms is consequently more demanding." Rasheed v.

Comm'r of Corr., 446 Mass. 463, 465 (2006); Attorney Gen. v. Desilets, 418 Mass. 316, 321 n.4

(1994). Conduct which impinges upon free exercise of religion is subjected to the "compelling

state interest" test. Desilets, 418 Mass. at 321 n.4. And, conduct motivated by sincerely held

religious beliefs must be recognized as the "exercise of religion." Id. at 323.

There is little doubt that the plaintiffs' beliefs regarding family values are religiously motivated.

Thus, there is little or no doubt that the plaintiffs have adequately pled a potential "free exercise"

violation of the Massachusetts Constitution. The defendants' memorandum gives this aspect of

the law short shrift.[22] They focus their entire MCRA argument upon the notion that the alleged

violation was not accomplished through "threats, intimidation or coercion." (Def. Mem., p. 18.)

Defendants ignore the fact that mandatory attendance at public school is coercive by

definition. The Supreme Court has long recognized this intuitively obvious fact. In the public

school setting, "the State exerts great authority and **coercive power** through mandatory

attendance requirements, and because of students' emulation of teachers as role models and the

children's susceptibility to peer pressure." Edwards, 482 U.S. at 584; (emphasis supplied); see

also Lee, 505 U.S. at 592 (noting heightened concerns of "subtle **coercive** pressure in the

elementary and secondary public schools"). Because minors are subject to mandatory

attendance requirements, the Court has emphasized "the obvious concern on the part of parents"

to protect them. Bethel Sch. Dist. v. Fraser, 478 U.S. 675, 684 (1986). Indeed, the Court has

referred to high school students as an "essentially captive audience of minors." Id. at 680.

---

[22]    On pages 17-18 of their memorandum, the defendants suggest that their conduct was "rationally related" to
a legitimate interest. They do not specifically advocate for the application of the "rational relationship" test. To
the extent such advocacy can be gleaned from the statement, it should not prevail insofar as the above-cited cases
clearly require "strict scrutiny."

It is perhaps also for this reason that the Commonwealth has passed the "opt out" statute discussed in Section IV below.  Failure to honor the "opt out" is a form of coercion.  This interpretation of the word "coercion" is consistent with the Supreme Judicial Court's expressed views.  The court has interpreted the terms of the act liberally because, as a civil rights act, it is remedial.  Batchelder v. Allied Stores Corp., 393 Mass. 819, 822 (1985).  The concept of "coercion" is not limited in "its scope to actual or attempted physical force."  Buster v. George W. Moore, Inc., 438 Mass. 635, 646-47 (2003).  If the Legislature wanted to limit the remedial effect of Sections 11H and 11I of the MCRA to actual or potential physical acts, it would have done so.  Id. at 647-48.  Accord, Lecrenski Bros. v. Johnson, 312 F. Supp. 2d 117, 122 (D. Mass. 2004); T&D Video, Inc. v. City of Revere, 17 Mass. L. Rep. 448, 2004 Mass. Super. LEXIS 72, at *19 (Feb. 10, 2004 Mass. Super.); Buster, 438 Mass. at 648.

Massachusetts courts that have upheld school committee actions emphasized the voluntary nature of the proceedings.  For example, Massachusetts has held that condom distribution programs aimed at high school age children in public schools do not violate parents rights.  Curtis, 420 Mass. at 763.  The lynchpin of the decision was that . . . "the condom-availability program in Falmouth is in all respects voluntary. . . .  Id. at 753.  There is no requirement that any student participate in the program."  Id. at 763.

The good faith allegation of an intent to indoctrinate, combined with the very young age of these children removes this matter from the purview of the Curtis holding. For the above reasons, the MCRA claim cannot be dismissed.

**IV.     A CLAIM IS STATED PURSUANT TO MASS. GEN. LAWS ch. 71, § 32A**

Massachusetts General Laws chapter 71, § 32A is entitled "Parental Notification of Human Sexual Education Curriculum."  It reads in pertinent part:

> Every city, town, regional school district or vocational school district implementing or maintaining curriculum which primarily involves human sexual education or human sexuality issues shall adopt a policy ensuring parental/guardian notification. Such policy shall afford parents or guardians the flexibility to exempt their children from any portion of said curriculum through written notification to the school principal. No child so exempted shall be penalized by reason of such exemption . . . . To the extent practicable, program instruction materials for said curricula shall be made reasonably accessible to parents, guardians, educators, school administrators, and others for inspection and review.

The plaintiffs were never notified that the books extolling homosexual behavior would be presented to their very young children. Thus, they seek relief pursuant to this statute.

Two grounds are offered to suggest the claim may not proceed. First, defendants suggest that the statute on its face it not implicated. (Def. Mem., p. 21.) Second, they suggest there is no private right of action. These will be discussed seriatim.

### A.      The Statute Is Clearly Implicated

The sole grounds for suggesting that the statute is not implicated is the word "primary." (Def. Mem., p. 21.) The defendants assert that the word primary is defined by the Massachusetts Department of Education, and thus the inquiry is limited. (Def. Mem., p. 21).

This court is not limited by the Massachusetts Department of Education's definition. Clearly, that definition is intended to apply to older children being taught the more biological aspects of human sexual behavior. Without question, however, the defendants' choice of material was intended to introduce very young children to the notion that homosexual behavior is moral. Indeed, the defendants do not deny this, but rather assert that their conduct was elsewhere required by statute.

Again, defendants ignore the good faith allegation of intentional indoctrination. The primary goal of the material being challenged was in fact the introduction of homosexuality.

### B.      A Private Right of Action Can Be Properly Implied

27

The question of whether to infer a private right of action from a state statute is decided by reference to the legislative intent.  The absence of express language allowing such a right is not at all determinative; it is indeed only the beginning of the inquiry.  See generally Borucki v. Ryan, 407 Mass. 1009 (1990)

The lead case in Massachusetts is Loffredo v. Center for Addictive Behaviors, 426 Mass. 541 (1998).  Therein, the Supreme Judicial Court denied a right in that particular instance, but reiterated the importance of recognizing that the court remained a "common-law court" with power to "supplement legislation" to include where necessary.  Loffredo, 426 Mass. at 545.  As such, its powers included "the power to supplement legislation in appropriate cases unless the Legislature explicitly prohibits us from doing so."  Id. at 545.

In some of its earlier formulations, the court was far more liberal in allowing such actions than Loffredo suggests it may be today.  In Loffredo, the Supreme Judicial Court took note that in 1911 it had written:  "It is a general rule of statutory interpretation that a violation of a duty created by statute, resulting in damage to one of the class for whose benefit the duty was established, confers a right of action upon the injured person . . . ."  Loffredo, 426 Mass. at 543 (citing Berdos v. Tremont & Suffolk Mills, 209 Mass. 489 (1911)).  If this earlier formulation was in effect, the plaintiffs would easily prevail.  There can be little doubt whatsoever that Mass. Gen. Laws ch. 71, § 32A was enacted specifically for the benefit of parents who might wish to exempt their children, for any reason, from certain aspects of education in the public schools. The mere fact that the Legislature created a specific statute to address a parent's right to opt his child out of particular areas of the school curriculum demonstrates that the Legislature was concerned enough about the rights of the parent to address the issue itself, rather than merely leaving the decision to the Department of Education.  Given this fact, one can not assume that

28

the Legislature would nevertheless allow the Department to have sole power over resolving

disputes regarding the sexual education of children.

Granted, <u>Loffredo</u> seems to create a slightly more difficult hurdle than did the very early

cases.  Even so, modern authority clearly supports the proposition that such a right would be

inferred here.  In <u>Ludlow Educ. Ass'n v. Town of Ludlow</u>, 31 Mass. App. Ct. 110, 120 (1991),

the court held that "where the applicable law evidences a special legislative concern for an

identified interest of a group of which plaintiff is a member, and not merely a concern for the

public generally, a private cause of action will be implied if the injury suffered falls within the

area of concern."  <u>Id.</u> at 120.  There, the statute at issue involved a prohibition on the Town's

increasing insurance premiums to be paid by town employees without first securing an

agreement under the collective bargaining process.  The court found that such a statute evinced

enough of a legislative concern for the rights of government employees to imply a private right

of action based on violations.  As in <u>Ludlow</u>, the plaintiffs are entitled to bring a civil suit

against the Town of Lexington for violation of the statute, despite the fact that nothing in the

statute specifically allows for a private right of action.

The issue is complicated further by the fact that the statute on its face contemplates some

fair adjudicatory proceedings.  Examination of the legislative history suggests a compromise

between those who wished a private right to be expressly included, and those who wished the

statute to be strictly advisory.[23]  The vague result requires the court to follow the <u>Ludlow</u>

precedent.

While the defendants cite several cases in which the court held no private right of action

---

[23]     An early version of Senate Bill 362 for the year 1996 includes an express right of civil action.  A copy of
this bill was obtained by the undersigned.  Other early versions include no adjudication.

to exist, these cases are inapposite.  In <u>Loffredo</u>, cited extensively by the defendants, the court emphasized that the plaintiffs were not seeking to infer a private cause of action from an actual statute, but rather from an agency regulation.  The court ruled that to infer such a right would require a "twofold stretch:  the judiciary infers a cause of action not to supplement a statute enacted by the Legislature, but to supplement a rule enacted by the executive, which itself supplements the statute."  <u>Loffredo</u>, 426 Mass. at 545.  Moreover, nothing in the statute indicated the kind of "special legislative concern for an identified interest of a group" distinguished in <u>Ludlow</u> as implying a private right of action.

In <u>Borucki v. Ryan</u>, 407 Mass. 1009 (1990), also cited by the defendants, the court noted that the statute prohibiting disclosure of mental health competency reports was probably drafted simply "to fill a gap in the new Mental Health Code."  <u>Id.</u> at 1009.  This implied that there was no specific intent on the part of the Legislature to create a private right of action.

Here, however, the Legislature created a specific right to offset the plenary control that local administrators have over education.  No doubt the Legislature was informed by the constitutional rights in issue.  (<u>See</u> Sections I and II, <u>supra</u>.)  In other words, the rights exist even absent the legislative enactment.  By codifying rights that are constitutionally based, the Legislature clearly intended an Article III forum for review.

The defendants argue, quoting <u>Loffredo</u>, that "where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."  <u>Loffredo</u>, 426 Mass. at 547.  While Mass. Gen. Laws ch. 71, § 32A provides that the Department of Education is responsible for resolving all disputes under the statute, the manner of such resolution in the text of the statute is left unclear.  The specific and detailed procedures for dispute resolution, cited by the defendants as expressing the Legislature's "clear intent that disputes regarding

M.G.L. c. 71 §32A be resolved at the local and agency levels," (see Def. Mem.), are in fact set out only in regulations promulgated by the Department of Education - it would be inappropriate to infer any legislative intent (or lack thereof) from regulations not actually set out by the Legislature.

Defendants note correctly that Section 34B of Chapter 71 allows for an action to be brought in Superior Court if an educational institution refuses to furnish a written transcript to a requesting student; however, it does not necessarily follow that any lack of such provision in other sections of the statute must indicate a clear intent to deny such an action.  Having been denied a transcript, a student would have no recourse either at common law or by way of constitutionally-defined rights, if not for the provisions of Section 34B.  Arguably, the Legislature sought to remedy that injustice by means of the above section.  However, given the seriousness of a parent's existing fundamental constitutional right to direct the moral upbringing of his own child, the Legislature had no explicit need to codify such a right.  One cannot assume that the lack of such explicit provisions implicates a specific desire to prevent a private right of action altogether.

For the above reasons, this count should survive.

## V.     QUALIFIED IMMUNITY HAS ONLY LIMITED APPLICABILITY

The defendants have asserted qualified immunity for all "individual actors."  (See Def. Mem., p. 25.)  For the most part, the claim is premature.

The defendants correctly assert that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  By focusing on objective

31

reasonableness, "the Supreme Court's decision in <u>Harlow</u> effectively eliminates from the qualified immunity calculus consideration of a government actor's subjective state of mind." <u>Collins v. Marina-Martinez</u>, 894 F.2d 474, 478 n.6 (1st Cir. 1990).

Qualified immunity, however, does not apply to the municipality itself, or to those acting in a supervisory or policymaking capacity.  <u>Owens v. City of Independence</u>, 445 U.S. 622 (1980); <u>see also</u> <u>Camilio Robles v. Hoyos</u>, 151 F.3d 1 (1st Cir. 1988).  The lead case discussing Section 1983 "supervisory liability" in the First Circuit is <u>Rodriguez v. Cartegena</u>, 882 F.2d 553 (1st Cir. 1989).  A supervisor can be held liable if (1) the behavior of his subordinates results in a constitutional violation, and (2) the supervisor's action or inaction is affirmatively linked to that behavior in that it could be characterized as supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference.  The indifference that is required to support supervisory liability under 42 U.S.C. § 1983 must be deliberate, reckless or callous.  It should lead "inexorably to the constitutional violation."  <u>Seekamp v. Michaud</u>, 109 F.3d 802, 809 (1st Cir. 1997).

The only non-supervisor named is Heather Kramer.  She was the teacher of the Wirthlins' child.  Plaintiffs acknowledge that as the evidence develops, Ms. Kramer may be able to demonstrate she is entitled to qualified immunity.  Moreover, plaintiffs have no interest in seeking damages from Ms. Kramer personally.  Plaintiffs, however, are reluctant to agree to dismiss Ms. Kramer at this juncture.  Surely Ms. Kramer had to know that her choice of books would offend the religious sensibilities of many students.  More importantly qualified immunity by definition applies only to the damages claims.  The defendants' brief concedes as much.

## VI.    THE CONSPIRACY CLAIM SURVIVES IF THE HYBRID RIGHTS CLAIM SURVIVES

"Agreement" is the essence of conspiracy.  <u>Commonwealth v. Fidler</u>, 23 Mass. App. Ct.
506, 513 (1987).  A civil conspiracy is:

> a combination of two or more persons acting in concert to commit an unlawful act, or to
> commit a lawful act by unlawful means, the principal element of which is an agreement
> between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act
> that results in damage.'

<u>Hampton v. Hanrahan</u>, 600 F.2d 600, 620-21 (7th Cir. 1979).  The allegation of agreement is
clear and supported by inference.  The most compelling such allegation is set forth in paragraphs
33-36 of the Complaint wherein the plaintiffs allege in detail that the defendants agreed to follow
the precepts of a narrow interest group.  Obviously, the conspiracy allegation can not stand if the
court rules that no underlying constitutional right is even implicated.  Therefore, all prior
arguments are re-iterated.  Assuming there to be a violation (<u>see</u> Sections I-II, <u>supra</u>), a
conspiracy is also well pleaded.

## CONCLUSION

"Probably no deeper division of our people could proceed from any provocation than
from finding it necessary to choose what doctrine and whose program public educational
officials shall compel youth to unite in embracing."  <u>West Virginia State Bd. of Educ. v.
Barnette</u>, 319 U.S. 624, 641 (1943).

A valid claim is asserted.  For the forgoing reasons the case may not be dismissed.

Respectfully Submitted,
PLAINTIFFS,
By their attorneys,


 _/s/ Robert S. Sinsheimer_____
Jeffrey A. Denner, Esq., BBO# 120520
Robert S. Sinsheimer, Esq., BBO# 464940
Neil Tasssel, Esq., BBO# 557943

33

Denner Pellegrino, LLP
4 Longfellow Place, 35th Floor
Boston, MA 02114
617-227-2800

Dated: September 15, 2006